HARSCO CORPORATION,
Plaintiff–Appellant,

v.

Rene SEGUI, Defendant,

MHC Holding Corp.; Dyson–Kissner–Moran Corp.; DKM–MLP Limited Partnership and Adler & Shaykin Fund II, L.P.,
Defendants–Appellees.

No. 1073, Docket 95–7929.

United States Court of Appeals,
Second Circuit.

Argued March 25, 1996.

Decided Aug. 1, 1996.

James J. Hagan, New York City (Joseph M. McLaughlin, Nancy L. Swift, Simpson Thacher & Bartlett, New York City, of counsel), for Plaintiff–Appellant.

Alvin B. Davis, Miami, FL (Jeffrey L. Kravetz, Steel Hector & Davis, Miami, FL, of counsel), for Defendant–Appellee Adler & Shaykin Fund II, L.P.

Yosef J. Riemer, New York City (Aitken Thompson, Kirkland & Ellis, New York City, Darrell K. Fennell, Philip M. Chiappone, Fennell & Chiappone LLP, New York City, of counsel), for Defendants–Appellees MHC Holding Corp., Dyson–Kissner–Moran Corp. and DKM–MLP Limited Partnership.

Before: NEWMAN, Chief Judge, FEINBERG and PARKER, Circuit Judges.

PARKER, Circuit Judge.

The central issue in this case is whether parties who negotiate at arm's length for the sale and purchase of a company can define the transaction in a writing so as to preclude a claim of fraud based on representations not made, and explicitly disclaimed, in that writing. The United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge*) answered this question affirmatively in dismissing plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. We agree and affirm the dismissal of plaintiff's fraud claims. We also agree that plaintiff's other causes of action should be dismissed.

## I. BACKGROUND

Plaintiff, the Harsco Corporation ("Harsco"), a Delaware corporation, sued various officers and shareholders of MultiServ, a Netherlands corporation which Harsco purchased. All of Harsco's claims arise out of its purchase of MultiServ.

Harsco's complaint contained eight counts. Count I charged all defendants with federal securities fraud under Rule 10b–5, 17 C.F.R. § 240.10b–5. Count II charged some defendants with breach of the written Purchase Agreement ("Agreement"). Count III sought indemnification from certain defendants stemming from the breach of contract claimed in count II. Count IV charged all defendants with common law fraud. Count V charged all defendants with common law negligent misrepresentation. Count VI charged two defendants with breach of fiduciary duty. And counts VII and VIII charged certain defendants under the theory of respondeat superior for the acts of other defendants.

The district court explained its dismissal of all counts in a Memorandum and Order dated April 4, 1995. The court dismissed the two fraud claims (counts I and IV) and the claim for negligent misrepresentation (count V), concluding from the complaint that Harsco would be unable to prove reasonable reliance—a required element of each claim. The court dismissed the breach of contract claim (count II), holding that the complaint failed to allege a breach of any specific representation. The indemnification claim (count III) was dismissed because it was contingent on the breach of contract claim. The court dismissed the breach of fiduciary duty claim (count VI), declining to hear a case over which the court had only supplemental jurisdiction when all federal claims had already been dismissed. Lastly the court dismissed the respondeat superior claims (counts VII and VIII) because the dismissal of their underlying theories of liability eliminated the prospect of vicarious liability.

The district court's substantive analysis of the various common law claims assumed that New York law applies. That assumption is not contested by the parties.

As discussed in greater detail below, the district court offered Harsco the opportunity to replead its theories of fraud and breach of contract in so far as those claims related to specific statements in the Agreement. Harsco declined the invitation to amend its complaint. Instead Harsco sought and received an order dismissing its case in order to take this appeal.

■ Because this is an appeal from a Rule 12(b)(6) dismissal, we review only the adequacy of the complaint, assuming the truth of plaintiff's factual allegations. *Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). Accordingly, the following factual summary is culled entirely from the complaint.

Harsco "engaged in domestic and international manufacturing and marketing of diverse goods and industrial services, principally for steel, industrial, commercial construction and infrastructure." ¶ 7. In early 1993, Harsco was interested in expanding its business internationally. ¶ 15. MultiServ's business, which was also connected to the steel industry, fit with Harsco's interest in international expansion. ¶ 15.

In April 1993, representatives of Harsco and MultiServ met to discuss the possibility of the purchase of MultiServ by Harsco. ¶ 17. One issue discussed during this meeting was a projection of future earnings contained in an offering memorandum, prepared by Morgan Stanley & Co., an investment banking firm. ¶ 17. At this meeting MultiServ's representatives stated that these projections reflected conservative economic assumptions and accounted for the prospects of "questionable plants." ¶ 17. The offering memorandum prompted Harsco to continue negotiations. ¶ 18. As part of the negotiating process, Harsco representatives were given access to MultiServ's chief financial officer during three days in May 1993. During this period of "exploratory due diligence," Harsco made numerous inquiries into the affairs of MultiServ. However, some of the documents which Harsco asked to see were not provided by MultiServ. ¶¶ 17–18.

On July 8, 1993, Harsco and MultiServ entered into the written "Agreement." ¶ 20. Harsco attached the Agreement to the complaint. Thus the Agreement became part of the complaint pursuant to Rule 10(c) of the Federal Rules of Civil Procedure. The Agreement is a sixty-plus page, single-spaced document, consisting of seven "articles" which in turn consist of numerous subsections, a definitions Section, and other schedules and attachments.

The Agreement's second article details the "Representations and Warranties" of the parties involved in the transaction. The only portion of the Agreement's second article which the complaint cites is "Section 2.04." ¶¶ 33, 34, 102, 107, 108. Section 2.04 is fourteen pages, single spaced, and consists of seventeen subsections, which in turn consist of numerous sub-paragraphs. Section 2.04 constitutes the defendants' "Representations and Warranties." A partial list of the numerous topics relating to the representations contained in Section 2.04 includes the capitalization of MultiServ, MultiServ's financial statements, MultiServ's liabilities, the ownership and condition of MultiServ's assets, MultiServ's litigation exposure, taxes, contracts, and environmental matters. Significantly, Harsco's complaint nowhere draws the court's or the defendants' attention to any specific portion or passage of Section 2.04.

Pursuant to the Agreement, Harsco agreed to buy all of MultiServ's outstanding stock and some of MultiServ's subordinated debt. The Agreement made the purchase of MultiServ contingent on fourteen days of "confirmatory due diligence." ¶ 22. The fourteen days of confirmatory due diligence occurred from July 8 to July 23, 1993. Section 1.04 of the agreement explained the terms of the confirmatory due diligence. ¶ 26. Section 1.04, which consists of only two paragraphs, states that

> purchaser and its accountants, consultants, and advisers shall be permitted … to review the premises, facilities, books and records and Contracts of [MultiServ], and to conduct interviews with Senior Multi-Serv Officers … regarding the business,

operations, financial condition and results of operations of [MultiServ], for the purpose of confirming the accuracy of the representations and warranties of the [sellers] contained in Article II hereof.

Section 1.04 also provided that Harsco's advisor, Coopers & Lybrand, would be allowed to review materials which MultiServ deemed confidential, such as pricing information, in order to determine MultiServ's overall profitability. However, Section 1.04 made clear that "Coopers & Lybrand shall not disclose any such [confidential] information to [Harsco]."

If Harsco learned that any of the seller's representations were not true during the fourteen days of confirmatory due diligence, then Harsco could terminate the deal. ¶ 25. Section 1.06(a) of the Purchase Agreement stated that if Harsco "determined, as a result of its Confirmatory Due Diligence, that the representations and warranties of the [Sellers] set forth in Article II hereof shall not have been, or shall not be, true and correct in all material respects ... then [Harsco] shall have the right to terminate" the sale during the fourteen days of confirmatory due diligence. Harsco did not terminate the deal, and the purchase closed on August 31, 1993. ¶ 28. The purchase required cash payments totalling $216 million and the acquisition of roughly $164 million in MultiServ debt. ¶ 29.

In a separate document, also dated July 8, Adrian Bowden, the CEO of MultiServ wrote a letter to Harsco stating that he was unaware of any significant problems facing MultiServ.[1] ¶ 24.

Harsco claims generally that "the representations and warranties made in Section 2.04 of the Agreement, and other representations made by [the sellers] contained misrepresentations and omissions of material facts." ¶ 34. Harsco alleges that because the purchase price was $380 million less the amount of certain debt, including project finance

debt, the seller had a motive to misrepresent the extent to which new projects were completed. ¶¶ 41–43. Against the background of this general allegation, Harsco tried to plead various discrete factual strains of fraud relating to, among other things, MultiServ's conduct during due diligence, the status of plant construction, the financial prospects for MultiServ operations, and the status of intellectual property rights. These factual theories of fraud are described in greater detail in part II.B.3. of this opinion.

## II. DISCUSSION

### A. Standard of Review

■ We review Rule 12(b)(6) dismissals de novo.

■ Dismissal under Rule 12(b)(6) is only proper when it appears beyond doubt that there are no set of facts in support of plaintiff's claim which would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In reviewing the dismissal of a complaint for 12(b)(6) insufficiency, the complaint is to be construed in the light most favorable to the plaintiff. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990). Furthermore, the appellate court "must accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993).

### B. Reasonableness of Reliance

As mentioned above, Count I of Harsco's complaint charged all defendants with violat-

---

1. This letter, though cited to and described in the complaint, was not attached to the complaint. We may nonetheless review the letter in its entirety. *San Leandro Emergency Medical Group*

*Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996). Doing so reveals that this letter concluded with a postscript

ing Sections 10(b) [2] and 20(a) [3] of the Securities Exchange Act, and with violating Rule 10b–5 [4] promulgated pursuant to § 10(b). Counts IV and V charged all defendants with common law fraud and negligent misrepresentation.

 The general rule is that reasonable reliance must be proved as an element of a securities fraud claim.[5] *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir. 1994) (Rule 10b–5 "makes unlawful any misrepresentation that would cause reasonable investors to rely thereon . . . .") (internal quotation marks omitted). *See also Paracor Finance, Inc. v. General Elec. Capital Corp.,* 79 F.3d 878, 886 (9th Cir.1996) ("Justifiable reliance is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm.") (internal quotation marks omitted); *Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609, 618 (7th Cir.1996) ("The fact of reliance . . . is not enough by itself; that reliance must be justifiable, or reasonable."); *One–O–One Enter., Inc. v. Caruso,* 848 F.2d 1283, 1286 (D.C.Cir.1988) ("plaintiffs' allegations must indicate that their reliance on the allegedly fraudulent representations was reasonable") (citing *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804 (1st Cir.1987)). Reasonable reliance must also be proved under New York law to recover for fraud and negligent misrepresentation. *See Channel Master Corp. v. Alu-*

which alerted the reader that the letter was to be of no legal effect.

2. Section 10(b), 15 U.S.C. § 78j(b), states
It shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Section 20(a) creates vicarious liability based on violations of § 10(b) and is not at issue independent of § 10(b).

4. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides that, in connection with the sale of securities, it is unlawful for a person
(a) To employ any device, scheme, or artifice to defraud,

*minium Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958) (fraud); *Heard v. City of New York,* 82 N.Y.2d 66, 75–76, 603 N.Y.S.2d 414, 419, 623 N.E.2d 541, 546 (1983) (negligent misrepresentation).

The district court held that Sections 2.05 and 7.02 of the Agreement preclude Harsco from establishing reasonable reliance. Section 2.05 specifically disclaims representations that are not in the agreement. It provides that the sellers

shall not be deemed to have made to Purchaser any representation or warranty other than as expressly made by [the sellers] in Sections 2.01 through 2.04 hereof. . . . Without limiting the generality of the foregoing, and notwithstanding any otherwise express representations and warranties made by the [sellers] in Sections 2.01 through 2.04 hereof . . . , the [sellers] make no representation or warranty to Purchaser with respect to:

(a) any projections, estimates or budgets heretofore delivered to or made available to Purchaser of future revenues, expenses or expenditures, future results of operations, [etc.]; or

(b) any other information or documents made available to Purchaser or its counsel, accountants, or advisors with respect to [MultiServ], except as expressly covered by a representation and warranty

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

5. The exceptions to this rule relate to circumstances where there are unusual "problems of proof." *Feinman v. Dean Witter Reynolds,* 84 F.3d 539, 541–42 (2d Cir.1996) (discussing *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), a class action in which the integrity of the market is alleged to have been compromised, and *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), where total non-disclosure of material information was alleged, as exceptions to the requirement to prove reliance).

contained in Sections 2.01 through 2.04 hereof.

Section 7.02 is a merger clause, which states that the Agreement "contains the entire agreement between the parties hereto with respect to the transactions contemplated by this Agreement and supersedes all prior arrangements or understandings with respect thereto."

Harsco argues that Sections 2.05 and 7.02 should not be treated as a bar to establishing reasonable reliance for three reasons. First Harsco claims that giving Sections 2.05 and 7.02 such effect contravenes § 29(a) of the Securities Exchange Act of 1934. Second, Harsco argues that under *Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir.1994), these Sections of the purchase agreement reflect an impermissible attempt to insulate the defendants from their own fraud. Third, Harsco argues that Sections 2.05 and 7.02 are not sufficiently specific to justify the district court's reliance on them. We reject each of these arguments.

### 1. Section 29(a)

■ Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), states that

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or any rule of an exchange required thereby shall be void.

"What the antiwaiver provision of § 29(a) forbids is enforcement of agreements to waive 'compliance' with the provisions of the statute." *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 228, 107 S.Ct. 2332, 2338, 96 L.Ed.2d 185 (1987). The underlying concern of § 29(a) is "whether the agreement weakens [the] ability to recover under the Exchange Act." *Id.* at 230, 107 S.Ct. at 2339 (citations and quotation marks omitted). Furthermore, the voluntariness of an agreement is irrelevant to whether § 29(a) forbids it. *Id.* "[I]f a stipulation waives compliance with a statutory duty, it is void under § 29(a), whether voluntary or

not." *Id.* Thus the question here boils down to whether Sections 2.05 and 7.02 of the Agreement weaken Harsco's ability to recover under § 10(b) of the Exchange Act in a way that § 29(a) prohibits.[6]

■ There can be no question that the Agreement "weakens" Harsco's ability to recover under the Act. As the district court observed the Agreement "outline[s], with great specificity, the representations and warranties that Harsco agreed to rely upon—and not rely upon—in purchasing all of MultiServ's outstanding stock." According to the district court, the Agreement limited the bases upon which a fraud action could be brought.

Thus, the Agreement can be described as weakening Harsco's ability to recover under § 10(b) of the Exchange Act. We think, however, that in the circumstances of this case such a "weakening" does not constitute a forbidden waiver of compliance. Here there is a detailed writing developed via negotiations among sophisticated business entities and their advisors. That writing, we conclude, defines the boundaries of the transaction. Harsco brings this suit principally alleging conduct that falls outside those boundaries.

Harsco relies heavily on *Rogen v. Ilikon Corp.*, 361 F.2d 260 (1st Cir.1966). In *Rogen*, the plaintiff, an individual shareholder of the defendant company, sued under § 10(b), alleging that he was induced to sell shares of a company back to the company at an unfair price by nondisclosure of positive information regarding the company's prospects. *Id.* at 263. The first circuit reversed the district court's summary judgment for defendants. The district court granted summary judgment in part because the sales agreement at issue stated that plaintiff

[was] fully familiar with the business and prospects of the corporation, [was] not relying on any representations or obligations to make full disclosure with respect thereto, and ha[s] made such investigation thereof as [plaintiff] deem[s] necessary.

---

**6.** We note that Harsco's § 29 argument, if successful, would only warrant reversal on the federal securities fraud claims. Section 29's affect, if any, does not extend to the common law claims.

*Id.* at 265. The court held that § 29(a) rendered such a contract provision void.

> [O]n analysis, we see no fundamental difference between saying, for example, 'I waive any rights I might have because of your representations or obligations to make full disclosure' and 'I am not relying on your representations or obligations to make full disclosure.' Were we to hold that the existence of this provision constituted the basis (or a substantial part of the basis) for finding non-reliance as a matter of law, we would have gone far toward eviscerating Section 29(a).

*Id.* at 268 (footnote omitted). Defendants analogize the contractual provision and the circumstances of *Rogen* to this case.

The analogy fails. First, the court in *Rogen* emphasized the disparity in bargaining power between the plaintiff, an individual whom a jury could conclude was "overtrusting," and the defendant corporation. *See id.* at 267–68. In contrast, it is apparent from the complaint and the Agreement in this case that both Harsco and defendants were sophisticated business entities negotiating at arm's length. The Agreement here reflects this relative parity. There is nothing in the first circuit's detailed opinion which suggests the presence in *Rogen* of anything like Sections 2.04, 2.05 and 7.02. In this case, Harsco was apparently content that the detailed disclosures and representations of Section 2.04 were sufficiently complete. Harsco further protected itself by negotiating for two weeks of confirmatory due diligence—the purpose of which was to confirm the accuracy of MultiServ's disclosures. If Harsco had been unable to confirm the truth of the representations in Section 2.04 during the due diligence period, Harsco could have terminated the deal. In short there is nothing in the complaint or the Agreement that indicates that Harsco was duped into waiving the protections of the securities laws.

Harsco bought Section 2.04's fourteen pages of representations. Unlike a contractual provision which prohibits a party from suing at all, the contract here reflects in detail the reasons why Harsco bought MultiServ—in essence, Harsco bought the representations and, according to Sections 2.05

and 7.02, nothing else. This means that there are fourteen pages of representations, any of which, if fraudulent, can be the basis of a fraud action against the sellers. But Harsco specifically agreed that representations not made in those fourteen pages were not made. Thus, it is not fair to characterize Sections 2.05 and 7.02 as having prevented Harsco from protecting its substantive rights. Harsco rigorously defined those rights in Section 2.04.

This analysis becomes a question of degree and context. Harsco has not waived its rights to bring any suit resulting from this deal. Each representation in Section 2.04 is a tooth which adds to the bite of Sections 2.05 and 7.02. In different circumstances (e.g., if there were but one vague seller's representation) a "no other representations" clause might be toothless and run afoul of § 29(a). But not here.

### 2. Policy Against Fraud

Harsco also argues that Sections 2.05 and 7.02 should not be given effect because doing so would run afoul of the policy of deterring fraud which we recognized in *Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir.1994). But *Turkish* does not help Harsco. In *Turkish* the contract (which was a settlement agreement) stated that the parties "have had full and complete access to all books, documents, records, litigation files and other sources of information affecting all litigations[.]" 27 F.3d at 25. Elsewhere the contract stated that certain representations were based on the advice of accountants, and that in the event those representations proved to be untrue, then plaintiff would only have one remedy (i.e., getting the loans repaid by the defendant). *Id.* at 25. The fraud alleged was that accountants never reviewed the accuracy of any of the representations. *Id.* at 27. We held the "full disclosure" clause to be no bar to suit. We emphasized that "plaintiffs do not claim that they relied on defendant's oral representations; rather, they claim that they relied on written representations in the contract itself." *Id.* at 28. We further distinguished a contract (such as the one here) which "specifically disclaims the existence of" the representations which

plaintiffs claim are fraudulent. *Id.* Because here Harsco claims that the representations outside the contract were fraudulent, and because the contract clearly delineates what representations have been made, *Turkish* does not apply.

### 3. Specificity of Disclaimer

■ Harsco's last claim is that the "no other representations" clause of Section 2.05 is not so specific as to put Harsco on notice of what it could not reasonably rely on. Harsco correctly states the rule announced by the New York Court of Appeals in *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959): where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon. We have recognized a similar principle in the securities fraud context. *See Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1033 (2d Cir.1993) (disclosure of risks in prospectus forecloses suit under 10b–5 claiming that the security was unsuited to plaintiff's investment objectives).

In *Danann* the contract (for the purchase of a lease on a building) stated that the seller had not "made . . . any representations as to the . . . expenses [or] operation . . . [of the building] and the Purchaser hereby expressly acknowledges that no such representations have been made." 5 N.Y.2d at 320, 184 N.Y.S.2d 599, 157 N.E.2d 597. The New York Court of Appeals held that this language "destroys the allegations in plaintiffs complaint that the agreement was executed in reliance upon . . . contrary oral representations." *Id.* at 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597.

Applying the *Danann* rule to the present circumstances, our task is to compare the language in Sections 2.04, 2.05, and 7.02 to the representations which Harsco claims are fraudulent, keeping in mind the arm's length nature of the negotiation and the sophistication of the parties. The purpose in making this comparison is to determine whether once Harsco entered into the Agreement, it became unreasonable to rely on the allegedly fraudulent representations.

To aid this analysis, we restate here the most relevant portion of Section 2.05. After reaffirming representations in article II (including the fourteen pages of Section 2.04 immediately preceding), Section 2.05 states that Defendants "make no representation or warranty to" Harsco regarding

(a) any projections, estimates or budgets heretofore delivered to or made available to Purchaser of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of [MultiServ] or the future business and operations of [MultiServ]; or

(b) any other information or documents made available to [Harsco] or its counsel, accountants or advisors with respect to [MultiServ] or the business and operations of [MultiServ], except as expressly covered by a representation and warranty contained in Sections 2.01 through 2.04 hereof.

In light of this language, we review Harsco's various factual theories of fraud.

### a. General Business Prospects

■ Paragraphs 48 and 49 of the Complaint asserted that the following allegations, made during the three days of preliminary due diligence in May 1993, were fraudulent: that "plants in Italy, Germany, the United Kingdom, France and Austria would experience a financial turnaround in 1993"; that MultiServ "would place new emphasis on developing its core steel business" and "phase out" other businesses; that MultiServ "expected growth in new areas of the world"; and that plants in China and Slovakia "would be fully operational in 1993 with no significant start up problems." On their face, these representations are "projections of . . . future business and operations"—exactly what Section 2.05 disclaims. In light of Sections 2.05 and 7.02, there is nothing in the Complaint which allows an inference of reasonable reliance on these representations.

The district court correctly dismissed the claims relating to these representations.

### b. The Russian Plant

 In paragraph 52 the Complaint alleges that certain defendants represented in July 1993, during confirmatory due diligence, that "the Russian Plant would be operating in the fourth quarter of 1993," and that those same defendants knew or should have known at that time that the main foundations for the Russian Plant had not been poured.[7] The question is whether the disclaimer of "information ... with respect to ... operations of [MultiServ], except as expressly covered by a representation and warranty contained in Sections 2.01 through 2.04 hereof" put Harsco on sufficient notice that representations regarding the Russian Plant could not reasonably be relied on. This is a closer call than the allegations contained in paragraph 48. Unlike relatively vague expectations of future performance complained of in that paragraph, here the allegation is more detailed: defendants knew the Russian Plant was not going to get built and represented otherwise.

Nevertheless, and again relying on the sophisticated context of this transaction, we hold that Harsco must be held to its agreement. There was no representation whatsoever about the Russian Plant in Sections 2.01 through 2.04. We think Harsco should be treated as if it meant what it said when it agreed in Section 2.05 that there were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction. Here, as in our analysis of § 29(a) of the Exchange Act, a less detailed Section 2.04 might lead to a different result. But the exhaustive nature of the Section 2.04 representations adds to the specificity of Section 2.05's disclaimer of other representations. We can see no reason not to hold Harsco to the deal it negotiated. Claims relating to the Russian Plant were also properly dismissed.

### c. French Self Dealing

 The complaint alleges numerous instances of improper conduct by the president of MultiServ's French subsidiary and accuses certain defendants of failing to disclose their knowledge of that misconduct: ¶¶ 57–68. The district court properly held that this portion of the complaint was deficient because Harsco's complaint failed to connect the alleged duty to disclose the French self-dealing with any representation from Section 2.04. The district court afforded Harsco an opportunity to fix its pleading. Harsco opted not to.

The pleading needed fixing because, again, we hold Harsco to the Agreement it negotiated and entered into. Under the circumstances of this case, "no other representations" means no other representations.

Ironically, in this instance there was a Section 2.04 representation which appears sufficiently inconsistent with the allegations of French impropriety to have allowed this claim to continue past the Rule 12(b)(6) stage. Section 2.04(i)(1) states that MultiServ was not "in violation ... of any Law ... where failure to be in compliance would have a Material Adverse Effect." Harsco's general citation to Section 2.04 does not suffice to invoke this small subset of the fourteen pages contained therein. As discussed below, fraud must be pleaded with particularity. Fed.R.Civ.P. 9(b). That requirement is not met by citing to fourteen pages of representations when only a few lines among those fourteen pages consist of a representation which plaintiff claims to be deceitful.

### d. Rights to Scarfing Technology

 Scarfing is the process by which surface defects are removed from slabs cast from liquid steel, before those slabs are

---

7. On its face, this representation as well as some of those discussed in the previous paragraph appear to be merely an unactionable statement of an opinion regarding future events. However, fraud liability may attach when a person "state[s] that something was to be done when he kn[ows] all the time it was not to be done and that his representations were false." *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 263, 151 N.E.2d 833, 836 (1958). Furthermore, a representation that a plant will be built is readily distinguishable from statements of " 'expectation' of higher sales" which we have held unactionable under the Rule 10b–5. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir.1982).

rolled. Scarfing is important to maintain the quality of the product. ¶ 69. The offering memorandum stated that MultiServ owned the intellectual property rights to the "Androfer" scarfing technology. ¶ 70. The sellers also represented that the Androfer technology is superior to other scarfing methods. ¶ 70. In reality, the rights to the Androfer technology were in dispute. ¶¶ 71–75. Harsco claims that defendants were aware of this reality and misrepresented it to Harsco. ¶ 76. The self-declared owner of the Scarfing technology has since offered the Androfer rights to Harsco for $3 million. ¶ 79.

Notably, other than the general invocation of Section 2.04, Harsco's complaint nowhere directs the reader's attention to any provision in the Agreement that relates to the status of MultiServ's intellectual property rights. Accordingly, this claim was also properly dismissed.

As with the claims relating to French improprieties, here too there is a short passage within Section 2.04, Section 2.04(k)(2)(A), which appears sufficiently inconsistent with the allegations relating to the state of the Androfer patent to warrant this claim continuing past a 12(b)(6) motion. Noting this, the district court allowed Harsco an opportunity to replead claims relating to intellectual property rights. Harsco declined in order to take this appeal.

### e. The Belgium Acquisition

■ Harsco claims that two defendants "represented that MultiServ would acquire the [Belgium] Plant in June or July of 1993 for approximately $13 million," ¶ 80, and that this representation was fraudulent. Section 2.04(*o*)(3) of the Agreement incorporated Exhibit 2.04(*o*)(3) to the Agreement. Exhibit 2.04(*o*)(3) states that the Belgium acquisition "is not expected to be completed until September or October of 1993." Sections 2.05 and 7.02, if they mean anything, mean that the representations in Section 2.04 trump representations outside the Agreement. Here again Harsco's complaint belies any suggestion of reasonable reliance. Dismissal under Rule 12(b)(6) was proper.

### 4. Claim Relating to Conduct During Due Diligence

■ There is one other factual strain of fraud that fails pursuant to Fed.R.Civ.P. 9(b), notwithstanding any of the above analyses. Rule 9(b) requires that allegations of fraud be pleaded with particularity. Thus we have explained that when a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990). The policy behind Rule 9(b) is (1) to provide a defendant with fair notice of plaintiff's claim, (2) to safeguard a defendant's reputation from "improvident charges of wrongdoing" and (3) to protect against the institution of a strike suit. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995).

Harsco's allegations relating to due diligence consist of the following: During the confirmatory due diligence, MultiServ's CEO (Bowden), took an "extended vacation." ¶ 44. Harsco did not know Bowden was going to go away during this time. ¶ 44. Also, other "key employees," including MultiServ's Comptroller, were "absent for substantial parts of the Due Diligence period." ¶ 44. Harsco's requests to speak with MultiServ's internal auditor during due diligence were met with a response that the auditor was unavailable. ¶ 45. MultiServ denied Harsco's requests to see and/or copy certain documents during this period as well. ¶ 46. Lastly, Harsco asked for access to MultiServ's books seven days a week during the due diligence period; MultiServ gave access for only six days a week. ¶ 47.

The only representation mentioned in this portion of the Complaint is that the auditor was unavailable. There is no explanation regarding why that representation may be fraudulent. Furthermore it cannot be said that denial of a request to see documents could constitute fraud, unless that denial suggested falsely and deceitfully that those documents did not exist (of which there is no

suggestion here). In short, the complaint's recitation of particulars relating to due diligence fall far short of the requirements of Rule 9(b).

In sum, all of the fraud and negligent misrepresentation claims were properly dismissed.

### C. Contract Claims

The district court also dismissed the claims for breach of contract and indemnification. We affirm the dismissal of these claims on an alternative basis. *See Leecan v. Lopes,* 893 F.2d 1434, 1435 (2d Cir.) (affirming on alternative grounds), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990).

The district court dismissed the breach of contract claims because "Harsco does not ... allege a breach of any specific representation and warranty contained within § 2.04." The district court may have applied an overly strict pleading standard to Harsco's breach of contract claim. *Cf. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (Fed.R.Civ.P. 9(b) applies only to allegations of fraud and mistake).

■ To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Tagare v. Nynex Network Sys. Co.,* 921 F.Supp. 1146, 1149 (S.D.N.Y.1996). *See also* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1235 (1990). Here paragraph 102 of the Complaint states

> In Section 2.04 of the Agreement, [certain defendants] made representations and warranties of material facts to Harsco concerning aspects of MultiServ's ... compliance with laws [and] proprietary rights. [Those same defendants] breached the Agreement and the provisions of Section

2.04 by reason of the material misrepresentations and omissions of facts alleged herein.

The complaint also alleges Harsco's performance under the Agreement and damages. ¶¶ 103, 105. These pleadings may be adequate to state a breach of contract claim based on the Agreement. Similarly, count III of the complaint, which alleges a claim for indemnification based on breach of contract, might also state a claim upon which relief can be granted.

We do not decide whether these portions of the complaint satisfy the requirements of notice pleading. While a prudent plaintiff complaining of a breach of contract should allege what representations or warranties were breached, it is not clear that notice pleading requires such specificity.

■ Nevertheless, we affirm the dismissal of the breach of contract and indemnification claims. The district court could not have properly exercised supplemental jurisdiction over these claims. The district court lacked diversity jurisdiction in this case.[8] Thus, the only basis for hearing the state law claims was under a theory of supplemental jurisdiction, assuming there were also federal claims. As discussed above, the federal securities law claims were properly dismissed prior to any responsive pleadings. In light of the early stage of this litigation, we affirm the dismissal of the breach of contract claims because the district court should have declined jurisdiction over them. We note that our reasoning, unlike that of the district court, leaves Harsco the possibility of bringing these claims in some state court (consistent with the requirements of state court procedures). *Cf. Morse v. University of Vermont,* 973 F.2d 122, 127–28 (2d Cir.1992) (holding it an abuse of discretion to decide novel state law claim under theory of supplemental jurisdiction after dismissal of federal claim).

---

**8.** Both Harsco and at least one defendant, MHC Holding Corp., are Delaware corporations. Thus complete diversity is lacking. *See* 28 U.S.C. § 1332(c)(1) ("A corporation shall be deemed to be a citizen of any State by which it has been incorporated."); *Cushing v. Moore,* 970 F.2d 1103, 1106 (2d Cir.1992) ("28 U.S.C. § 1332 requires complete diversity between all plaintiffs and all defendants.").

## D. Other Claims

■ The district court acted well within its discretion when, after dismissing the federal claims, it also chose to dismiss the claims for breach of fiduciary duty. Furthermore, there being no surviving underlying theory of liability, the respondeat superior claims were also properly dismissed.

### III. CONCLUSION

Accordingly, we affirm the dismissal of Harsco's complaint. However, because our reasoning is different than the district court's regarding the dismissal of the state law breach of contract and indemnification claims, Harsco may be able to bring that claim in state court, if state court procedure so allows. Similarly, there may also be a forum in which Harsco's claim for breach of fiduciary duty may be heard, but that forum is not federal court.