Nathan A. CHAVIN, Lanny Lambert, and Chalam Advertising, Inc., Plaintiffs,

v.

Andrew McKELVEY and TMP Worldwide, Inc., Defendants.

No. 98 CIV. 4308(SAS).

United States District Court, S.D. New York.

Oct. 29, 1998.

Jonathan Koles, Jersey City, NJ, for Plaintiffs.

Christopher J. Sullivan, Herrick, Feinstein LLP, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This case involves claims arising out of plaintiffs' relinquishment of stock conversion rights. Defendants have moved to dismiss plaintiffs' claims for violations of sections 10(b) and 20(a) of the Securities and Exchange Act, breach of contract, common law fraud and breach of duty. For the following reasons, plaintiffs' federal claims are dismissed. Because I decline to exercise jurisdiction over the remaining state law claims, this case is also dismissed.

### I. Standard of Review

Dismissal of a complaint pursuant to Fed. R.Civ.P. 12(b)(6) is proper "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Scotto v. Almenas*, 143 F.3d 105, 109–10 (2d Cir.1998) (quoting *Branham v. Meachum*, 77 F.3d 626, 628 (2d Cir.1996)) (internal quotations omitted). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)). Thus, in deciding such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998).

### II. Factual Background

Plaintiff Chalam Advertising, Inc. ("Chalam") is a New York corporation specializing in real estate advertising. Plaintiffs Nathan A. Chavin ("Chavin") and Lanny Lambert ("Lambert") were, prior to January 14, 1994, the sole officers, directors and shareholders of Chalam. *See* First Amended Complaint ("Cmplt."), at ¶ 1. Defendant TMP Worldwide, Inc. ("TMP") is a Delaware corporation with its primary place of business in New York. Defendant Andrew J. McKelvey ("McKelvey") is TMP's president.

For purposes of this motion, the following facts are assumed to be true. On January 14, 1994, TMP, Chalam, Chavin and Lambert entered into a series of contracts creating a joint venture between Chalam and TMP, in-

cluding a stock purchase agreement pursuant to which TMP purchased fifty percent of Chalam's stock and an operating agreement between Chalam and TMP. *See id.* at ¶ 6, Ex. 1. In addition, Chalam entered into employment agreements (the "Prior Employment Agreements") and consulting agreements with both Chavin and Lambert. *See id.* at ¶ 6; Affidavit of Nathan A. Chalam, at Ex. 3.[1] Each Prior Employment Agreement provided that it would terminate on January 13, 1997, unless terminated pursuant to the terms of the agreement, and that the agreement "shall be deemed automatically extended for additional one year periods" ("Renewal Terms") unless either party notifies the other to the contrary, in writing, at least 30 days prior to the end of [the term]." The termination provision of each Prior Employment Agreement provided that the agreement would terminate automatically upon the termination of the operating agreement, that the employee could terminate upon prior written notice, and that Chalam could terminate only upon the executive's death or "for cause," which was defined as "conviction of a felony," or the executive's incapacity.

As part of this transaction, on January 14, 1994, the parties also entered into an agreement (the "Conversion Agreement") pursuant to which Chavin and Lambert were given the option to convert all of their Chalam stock into TMP stock after TMP effected an initial public offering. *See* Cmplt. at Ex. 1. This agreement, unlike all of the other agreements executed on that day, did not specify that it terminated on January 14, 1997.

In the later half of 1996, as the expiration date of the agreements approached, McKelvey, Chavin and Lambert began to negotiate successor agreements. *See id.* at ¶ 11. During this time, employees of TMP advised Chavin and Lambert that McKelvey, believing that the stock conversion formula in the Conversion Agreement was too favorable to Chavin and Lambert and too unfavorable to

TMP, wanted to change the formula to reduce the number of shares that Chavin and Lambert would get upon conversion. *See id.* at ¶ 12. McKelvey then allegedly undertook a series of negotiations with Chavin and Lambert with the objective of causing Chavin and Lambert to part with half of their conversion rights for no or grossly inadequate consideration. *See id.* at 13.

On or about September 10, 1996, McKelvey drafted a term sheet for interim employment agreements with Chavin and Lambert that would redefine Lambert's and Chavin's job responsibilities with Chalam and would run from September 15, 1996 until December 31, 1996. *See id.* at ¶ 14, Ex. 2. McKelvey led Chavin and Lambert to believe that he not only wanted them to continue working with TMP, but that he wanted them to target other real estate advertising agencies for TMP to acquire. *See id.* at ¶ 15. The term sheet provided that if Chavin and Lambert did not wish to continue with the agreement after December 31, 1996, "TMP agrees to return all of the stock to Chavin & Lambert at no cost"; it also provided that if Chavin and Lambert "do not perform their responsibilities as agreed during this trial period, then TMP has the right to also terminate the agreement." The term sheet was not signed by the parties.

During a meeting late in the evening of September 16, 1997, McKelvey told Chavin and Lambert that he wanted them to sign an agreement to "clean-up" their conversion rights because the underwriters for TMP's initial public offering wanted to make the offering more attractive. *See id.* at ¶ 17. Under the agreement signed by the parties on that date (the "September 16 Agreement"), Chavin and Lambert agreed that instead of converting all of their Chalam stock into TMP stock, they would have the right to convert only half of their stock. *See id.* at Ex. 3. According to the Complaint, Chavin and Lambert relied upon McKelvey's

---

1. Plaintiffs submitted to the Court a memorandum of law below the Court's page limit and an affidavit of Nathan Chavin. In considering a motion to dismiss, the court must rely upon the Complaint, any written instrument attached to it and any documents or statements incorporated by reference. *See Cortec Inds., Inc. v. Sum Hold-*

*ing L .P.,* 949 F.2d 42, 47 (2d Cir.1991). To the extent that Chavin's affidavit contained any legal arguments, the Court considered it as part of plaintiffs' memorandum of law. The Court also considered documents attached to the affidavit that were incorporated by reference in the Complaint.

promise that TMP and Chalam would enter into new employment agreements with them to be effective starting in January 1997, and that these agreements would grant them additional salary compensating them fully for the relinquishment of half of their conversion rights. *See id.* at ¶ 22.

The September 16 Agreement also specified that Chavin and Lambert retained their conversion rights even if they chose to terminate their employment with Chalam at the end of 1996. McKelvey either misrepresented to Chavin and Lambert, or expressed his mistaken belief, that under the Conversion Agreement, Chavin and Lambert's conversion rights would have otherwise expired on January 15, 1997. *See id.* at ¶ 19.

After several weeks of negotiations among McKelvey, Chavin, Lambert and their respective legal counsel, the parties entered into a new agreement (the "Letter Agreement"), covering the period from October 7, 1996 until January 13, 1997, which was designated as the "Trial Period." *See id.* at ¶ 24, Ex. 4. This agreement grants Chavin and Lambert new job responsibilities. *See id.* at ¶¶ 25–27. The Letter Agreement provides that "[i]n the event that at the expiration of the Trial Period, Chavin, Lambert and TMP are satisfied with the results of this trial, Chavin and Lambert shall each enter into new employment agreements with Chalam (collectively, the 'New Employment Agreements') in substantially the form of the [Prior Employment Agreements]." *See* Letter Agreement, at ¶ 2. The Letter Agreement then specifies specific terms that will be included in the New Employment Agreements, including the provision that during the initial three-year period of the agreements, Chalam can only terminate Chavin or Lambert if he "does not perform his responsibilities as in the past." *See id.*

The Letter Agreement further provides that

[i]n the event that prior to the expiration of the Trial Period Chavin or Lambert on the one hand or TMP on the other hand provides notice to the other(s) that one or more of them does not wish the [Prior Employment Agreements] to continue beyond the Trial Period . . . , the parties shall

not be required to enter into the New Employment Agreements.

*See id.* at ¶ 3. In such an event, the Prior Employment Agreements "shall not be subject to renewal." *See id.*

The Letter Agreement also sets out that the New Employment Agreements will provide for increased salaries for Chavin and Lambert, the compensation to which Chavin and Lambert believed they were entitled for having relinquished some of their conversion rights. *See* Cmplt. at ¶¶ 29–30. In addition, the agreement terminates the conversion rights contained in the Conversion Agreement and, like the September 16 Agreement, provides that Chavin and Lambert can convert half of their Chalam stock upon TMP's initial public offering, which together totalled 25% of the outstanding common stock of Chalam.

The Letter Agreement also contains a merger clause specifying that the agreement supersedes any prior agreements between the parties, including all inconsistent provisions in the agreements executed on January 14, 1994, as well as the September 16 Agreement, and states that it "may not be amended, terminated or waived orally." *See* Letter Agreement, at ¶ 6. In addition, the agreement states that "[n]o party has relied on any representation not set forth in this letter agreement." *See id.*

In January 1997, TMP issued its initial public offering. On or about the beginning of February 1997, plaintiffs notified TMP that they intended to convert their Chalam stock into TMP stock, and the parties effected that conversion some time thereafter. *See* Memorandum of Law in Opposition to Defendants' Pre–Answer Motion to Dismiss Complaint, at p. 9. Throughout the term of the Letter Agreement, McKevley had informed Chavin and Lambert that TMP was satisfied with their job performance and by further agreements, the parties extended the term of the Letter Agreement through February 24, 1997. *See* Cmplt. at ¶¶ 38, 40. On February 13, 1997, however, after McKelvey informed Chavin and Lambert that TMP had decided not to venture further into real estate advertising, TMP informed Chavin and

Lambert that it would not approve Chalam's entering into new employment agreements with them, thereby denying them the additional compensation to which they believed they were entitled. *See id.* at ¶¶ 41–42. Plaintiffs allege that McKelvey never intended to approve the New Employment Agreements, no matter how well they performed. *See id.* at ¶ 43.

## III. Discussion

### A. *Securities Fraud*

Plaintiffs assert a claim against defendants for securities fraud under section 10(b) of the Securities and Exchange Act, which bars the use of deceptive devices or fraud in connection with the purchase or sale of a security. They also assert that McKelvey is liable for the alleged fraud as a controlling person of TMP under section 20(a) of the Act.

Plaintiffs' theory of the alleged fraud is that in the course of negotiating the September 16 Agreement and the Letter Agreement, McKelvey convinced plaintiffs to relinquish half of their conversion rights by fraudulently promising them increased compensation under new employment agreements, which he never intended to provide. Plaintiffs further claim that under the terms of the Letter Agreement, TMP was obligated to cause Chalam to enter into new employment agreements unless Chavin and Lambert failed to perform their jobs satisfactorily.

In order to prove a claim of securities fraud, plaintiffs must establish that they reasonably relied upon the alleged misrepresentations. *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994)("Rule 10b–5 makes unlawful any misrepresentation that would cause reasonable investors to rely thereon. . . ."). "Justifiable reliance is a limitation on a rule 10b–5 action which insures that there is a casual connection between the misrepresentation and the plaintiff's harm." *Harsco*, 91 F.3d at 342 (citing *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 79 F.3d 878, 886 (9th Cir.1996)).

Plaintiffs claim that McKelvey, on various occasions, fraudulently promised that if they gave up half of their conversion rights, they would receive compensating future pay as long as they performed their duties in the Letter Agreement satisfactorily. *See* Cmplt. at ¶ 50. Defendants argue that plaintiffs cannot prove reasonable reliance on these misrepresentations as a matter of law because the Letter Agreement signed by the parties contains an express provision disclaiming reliance on any oral representations. "[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." *Harsco*, 91 F.3d at 345 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)). The Second Circuit has expressly adopted this principle, established in the context of common law fraud and fraudulent inducement, in the context of securities fraud. *See id.*

In order to invoke the rule enunciated by *Danann*, however, the disclaimer at issue must be adequately specific. *See Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, 96 Civ. 3231, 1998 WL 167330, at *18 n. 24 (S.D.N.Y. April 8, 1998). In *Harsco*, the Second Circuit addressed the issue of whether a clause disclaiming reliance on representations outside the agreement was adequately specific to bar plaintiffs from relying upon oral representations as the basis of a securities fraud claim.

The contract at issue in *Harsco*, which provided for the sale of a business from defendants to plaintiffs, contained an extensive provision setting forth the seller's representations and warranties as to the business. The agreement also provided that the sellers "shall not be deemed to have made to Purchaser any representation or warranty other than as expressly made [herein]," including representations with respect to any projections, estimates or budgets or any other information or documents made available to purchaser. *Id.* 91 F.3d at 342–43. The contract also contained a standard merger clause.

The court in *Harsco* stated that a broad "no other representations" clause would not be sufficient to bar fraud claims in all cases. It held, however, in upholding the district court's dismissal of plaintiff's securities claims, that because the sale contract at issue contained specific and exhaustive representations about the business in addition to the disclaimer, the *Danann* rule made reliance on any representations not contained within the agreement, or representations inconsistent with those set forth in the agreement, unreasonable.

Similar to the disclaimer in *Harsco,* the Letter Agreement explicitly provides that "[n]o party has relied on any representation not set forth in this letter agreement." *See* Letter Agreement, at ¶6. Although this clause, by itself, would likely be inadequate to foreclose plaintiffs' claim that it was fraudulently induced to enter into the Letter Agreement, like the disclaimer in *Harsco,* the clause is informed by the other provisions in the agreement.

The Letter Agreement provides that "[i]n the event that at the expiration of the Trial Period, Chavin, Lambert and TMP *are satisfied with the results of this trial,*" the parties will enter into new employment agreements. *See id.* at ¶2 (emphasis added). Furthermore, it states that "[i]n the event that...Chavin or Lambert on the one hand or TMP on the other hand provides notice to the other(s) that one or more of them *does not wish* the [Prior Employment Agreements] to continue...the parties *shall not be required to enter into the New Employment Agreements.*" *See id.* at ¶3(emphasis added). This language clearly and unambiguously states that TMP retains the right not to approve the New Employment Agreements if it does not "wish" to do so or if it is "dissatisfied" with the results of the Trial Period. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990)("if a contract is unambiguous on its face, its proper construction is a question of law"). There is nothing in the agreement suggesting that TMP could only withhold its approval of the New Employment Agreements if it was dissatisfied with plaintiffs' job performance. In fact, there are no limita-

tions at all placed on the permissible basis for TMP's dissatisfaction. The Complaint explains TMP's reason for not approving the agreements: it had decided not to venture further into the area of real estate advertising.

Plaintiffs argue that the Term Sheet, which states that if plaintiffs did not "perform their responsibilities as agreed," TMP could "terminate" the agreement, indicates that the Letter Agreement should be read to incorporate such a requirement. The Letter Agreement itself, however, contains no such language. "It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *International Klafter Co., Inc. v. Continental Cas. Co., Inc.,* 869 F.2d 96, 100 (2d Cir.1989). Here, the language of the contract unambiguously provides that TMP has the option, if it is "satisfied" and if it "wishes" to continue the relationship with plaintiffs, to cause Chalam to renew the employment contracts. According to the terms of the Letter Agreement, only after the parties had entered into the new three-year employment agreements did defendants become restrained from terminating plaintiffs unless they did not "perform [their] responsibilities as in the past." *See* Letter Agreement, at ¶2. Moreover, the Letter Agreement expressly states that it supersedes all prior agreements between the parties.

Plaintiffs also argue that the parties intended the "for cause" requirement in the Prior Employment Agreements to be incorporated into the Letter Agreement. The Prior Employment Agreements, however, provided that plaintiffs could only be *terminated* for cause. The renewal provisions of those agreements provided, like the Letter Agreement, that any party could elect not to renew the agreements—without reference to any limitations—if that party supplied notice.

In determining whether a party has reasonably relied upon alleged misrepresentations, the court's "task is to compare the language in [the contract] to the representations" that are claimed to be fraudulent. *Harsco,* 91 F.3d at 345. "The purpose in

making this comparison is to determine whether once [the party] entered into the Agreement, it became unreasonable to rely on the alleged fraudulent representations." *Id.*

■ Plaintiffs are sophisticated businessmen who were represented by counsel in the negotiations of the Letter Agreement. They entered into an agreement that provides that TMP has the option, but not the obligation, to renew the employment agreements, that explicitly states that it supersedes all prior agreements between the parties and that disclaims reliance on any prior representations. In such a circumstance, reliance upon McKelvey's prior oral representations that he would ensure that Chalam entered into successor agreements as long as plaintiffs performed satisfactorily was not reasonable. *See Lucas v. Oxigene, Inc.,* 94 Civ. 1691, 1995 WL 520752, at *5 (S.D.N.Y. August 31, 1995), *aff'd,* 101 F.3d 109 (2d Cir.1996)(reliance on oral representations that Board of Directors would definitely approve vesting of employee's options unreasonable where contract gave Board the discretion to grant the approval and contract stated that no other representations had been made); *Warner Theatre Assocs. Ltd. Partnership v. Metropolitan Life Ins. Co.,* 97 Civ. 4914, 1997 WL 685334, at *3 (S.D.N.Y. November 4, 1997)(on motion to dismiss, finding no reasonable reliance on allegedly false representations that defendant would provide mortgage satisfying plaintiff's requirements where contract stated that defendant had not agreed to "any of the basic terms" of the mortgage); *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1033 (2d Cir.1993)(no justifiable reliance on executives' alleged assurances of investment's suitability where statements were contradicted by offering materials sent to investors).

Because they could not have reasonably relied on defendants' alleged misrepresentations, plaintiffs' claim for securities fraud is dismissed.

**B. *Fraud on the Market***

■ Plaintiffs also allege that defendants' misrepresentations constituted a "fraud on the market" for TMP common stock.

The fraud on the market theory is based upon the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under the fraud on the market theory, a plaintiff does not have to prove direct reliance on alleged misrepresentations where it has relied on the integrity of the market. *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 748 (2d Cir.1992). Reliance will be presumed where securities are traded on an open and efficient market, because in such a market the price of securities reflects all available public information affecting their value. *See In re Laser Arms Corp. Securities Litigation,* 794 F.Supp. 475, 490 (S.D.N.Y.1989), *aff'd,* 969 F.2d 15 (2d Cir.1992). This theory "permits a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct, which ordinarily would be difficult to come by given the difference between today's markets and the face-to-face transactions underlying the old common law fraud cases...." *Litton,* 967 F.2d at 748.

Courts in this circuit have limited the application of the fraud on the market theory to publicly offered securities in developed, efficient markets. *See In re Towers Financial Corp. Noteholders Litigation,* 93 Civ. 0810, 1995 WL 571888, at *22 (S.D.N.Y. September 20, 1995)("fraud on the market limited to developed markets, which represent the 'efficient market' model"); *In re Laser Arms Corp.,* 794 F.Supp. at 490 (fraud on the market theory inapplicable to newly issued notes); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 339 (S.D.N.Y. 1993)(no presumption of reliance where partnerships were "offered privately and were not traded actively in a large public market").

█ Plaintiffs claim that McKelvey fraudulently induced them to relinquish some of their conversion rights with respect to TMP stock. Plaintiffs, however, could not have relied upon the integrity of any developed market in making their decisions to relinquish these conversion rights. At the time that McKelvey made the alleged misrepresentations, TMP's common stock was not traded publicly; the initial public offering did not occur until January 1997. Plaintiffs relinquished their conversion rights in the course of face-to-face negotiations with McKelvey, not in the course of any open market transaction. In this circumstance, a fraud on the market theory is not applicable.

## IV. Conclusion

For the reasons set forth above, plaintiffs' securities fraud claims are dismissed. Plaintiffs have no other ground for federal jurisdiction, and I decline to exercise supplemental jurisdiction over their state law claims. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 61 (2d Cir.1998). The clerk is directed to close this case.

SO ORDERED: