# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSEPH GOLDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0434-MTZ |
| | ) | |
| SHOOTPROOF HOLDINGS, LP, | ) | |
| SHOOTPROOF HOLDINGS GP, LLC, | ) | |
| SHOOTPROOF, LLC, PSG EQUITY L.L.C., | ) | |
| PROVIDENCE STRATEGIC GROWTH III | ) | |
| L.P., PROVIDENCE STRATEGIC GROWTH | ) | |
| III-A L.P., STEPHEN MARSHALL, and | ) | |
| THOMAS MCDERMOTT, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 9, 2022
Date Decided: February 28, 2023

Michael A. Barlow, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Rollo C. Baker, IV, Margaret Schmidt, QUINN EMANUEL URQUHART & SULLIVAN, New York, New York, *Attorneys for Plaintiff*.

Bradley R. Aronstam, S. Reiko Rogozen, Holly E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Yehudah L. Buchweitz, Joshua S. Amsel, Andrew Cauchi, WEIL, GOTSHAL & MANGES LLP, New York, New York, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

This case presents a familiar story. Two co-founders started a business that succeeded and grew into a target for an acquisition. When the company entered negotiations with a purchaser, the plaintiff co-founder emphasized the importance of the management team and employees, including the plaintiff's spouse, staying on with the new post-transaction company. According to the plaintiff, the purchaser and its affiliates and agents assured him that he and his management team would have prominent roles in the new company, and that together they would incentivize employee retention. The agreements documenting the merger did not make any such assurances; they also contained integration and antireliance language. After the transaction closed, the new company fired the plaintiff and his spouse.

The plaintiff, a Washington state resident, filed an action in this Court against the purchaser and its affiliates and agents alleging the defendants violated Washington securities law. Count I alleges the defendants made misleading statements in connection with a sale of securities. Count II alleges certain of the defendants are jointly and severally liable for those misleading statements.

The two individual defendants, who are not Delaware residents, sought dismissal for lack of personal jurisdiction. The plaintiff argues this Court can exercise personal jurisdiction over the individual defendants via the merger agreement's forum selection clause because they were third-party beneficiaries or closely related to the agreement. The plaintiff also argues the individual defendants

1

engaged in substantial acts in Delaware in connection with the merger that subject them to personal jurisdiction under Delaware's long arm statute. This opinion concludes neither route secures personal jurisdiction over the individual defendants.

All the defendants moved to dismiss the complaint for failure to state a claim due to the plaintiff's contractual inability to rely on extracontractual statements. The plaintiff argues the antireliance and integration provisions are void because they impermissibly waive claims under Washington securities law. The defendants argue the provisions do not act as a waiver and are not void, but rather narrow the universe of possible statements the plaintiff can contest as misleading. Washington law supports the defendants' argument. Accordingly, I grant the defendants' motion and the complaint is dismissed.

## I.     BACKGROUND[1]

Plaintiff Joseph Golden ("Plaintiff"[2]), a Washington resident, is the former co-founder and co-CEO of Collage.com, Inc. ("Collage"). Nonparty Kevin Borders was Collage's other co-founder and co-CEO. Founded in 2007, Collage was an e-commerce business offering a variety of customizable photo and home products.

In late 2020, Collage met with defendant ShootProof, LLC ("ShootProof"), a Georgia limited liability company headquartered in Georgia that provided amateur and professional photographers with tools to market and sell their photographs online. Defendant Stephen Marshall, a Georgia resident, was ShootProof's CEO, and Defendant Thomas McDermott, a Georgia resident, was its CFO (together with Marshall, the "Individual Defendants"). ShootProof's private equity sponsor was Defendant PSG Equity L.L.C. ("PSG"), a Delaware limited liability company, which

---

[1] I draw the following facts from the Verified Complaint, the documents attached and integral to it, affidavits, and any discovery of record. Docket Item ("D.I.") 1 [hereinafter "Compl."]. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014); *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008) (citing *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007)). Citations in the form of "OB —" refer to the Opening Brief in Support of Defendants' Motion to Dismiss Plaintiff's Verified Complaint, available at D.I. 14. Citations in the form of "AB —" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss, available at D.I. 16. Citations in the form of "RB —" refer to the Reply Brief in Further Support of Defendants' Motion to Dismiss Plaintiff's Verified Complaint, available at D.I. 19.

[2] Plaintiff is married to nonparty Lindsey Golden. Compl. ¶ 3. To the extent this opinion refers to Joseph Golden and Lindsey Golden by their first names, it is in pursuit of clarity and without intending any disrespect or familiarity.

"invests in growth-stage software businesses and the founders and management teams that drive them."[3] PSG invested in ShootProof through ShootProof's majority owner, Defendant ShootProof Holdings, LP ("Holdings"), a Delaware limited partnership.[4] ShootProof Holdings GP, LLC ("Holdings GP") is Holdings's general partner, and Defendants Providence Strategic Growth III L.P. and Providence Strategic Growth III-A L.P. are Delaware limited partnerships and Class A Preferred Limited Partners in Holdings (together with PSG, ShootProof, Holdings, Holdings GP, and the Individual Defendants, "Defendants").

On December 2, 2020, Collage and ShootProof executed a letter of intent that outlined the basic terms of an acquisition. ShootProof proposed acquiring Collage for $82.5 million, to be adjusted upward or downward based on formal valuation and diligence, but "no less than" $26.5 million of that consideration would be in the form of "rollover equity by key Collage managers into ShootProof equity interests."[5] The letter of intent reflected Defendants' belief that "Collage represent[ed] an opportunity to invest behind," and partner with, "a strong team."[6] Defendants also emphasized that "PSG has a strong track record of partnering with founders and

---

[3] PSG's principal place of business is in Boston, Massachusetts. *Id.* ¶ 13.

[4] Holdings's principal place of business is in Georgia. *Id.* ¶ 10.

[5] *Id.* ¶ 40.

[6] *Id.* ¶ 41 (emphasis omitted).

management teams to scale software companies."[7] Collage viewed ShootProof as "a strong strategic partner" to help it grow and succeed.[8]

Between December 2020 and March 2021, ShootProof, PSG, and Collage negotiated ShootProof's acquisition of Collage by combining Collage and a merger subsidiary into a single surviving ShootProof subsidiary, called Foreground. Plaintiff and Borders negotiated on behalf of Collage. While the Individual Defendants negotiated on behalf of ShootProof, their "strategic decisions and substantive positions" aligned with PSG.[9]

Plaintiff and Borders made clear to Defendants that they would not proceed with the transaction absent representations and assurances that they would have active and substantial roles in the surviving entity, and that Collage employees would keep their positions. Plaintiff negotiated for the payment of retention bonuses to Collage employees. In January 2021, Plaintiff spoke with Marshall about developing a post-closing retention plan for Collage employees because he believed Collage's employees were key to the company's future success. Marshall agreed retention was important and suggested Plaintiff work with PSG to develop a plan. In February 2021, Plaintiff discussed with Defendants, including PSG, the

---

[7] *Id.*

[8] *Id.* ¶ 43; *see id.* ¶¶ 42–45.

[9] *Id.* ¶¶ 46–47.

mechanics of the retention bonuses. Marshall stated that his "number one concern" was to make sure "no one goes anywhere."[10] Later that month, Marshall circulated a draft slide deck directed toward Collage employees announcing, "We're growing; no roles are being eliminated."[11]

In late February 2021, Lindsey Golden, Collage's general counsel and Plaintiff's spouse, emailed the Individual Defendants to seek clarity about her role as general counsel in the surviving entity since ShootProof did not have in-house counsel. On March 2, McDermott affirmed that Lindsey would have a role as counsel in the surviving entity and provided her with a list of "short term needs."[12] The Individual Defendants confirmed Lindsey's role in a phone call with her the next day.[13] Also on March 2, Marshall emailed Plaintiff about compensation and titles in the surviving entity. Marshall indicated he was "concerned about using the 'President' title" for Plaintiff, and instead proposed exploring "Chief Economist" or "other CxO titles."[14] Marshall stated Borders would "tak[e] on the CTO title and role."[15]

---

[10] *Id.* ¶ 53 (emphasis omitted).

[11] *Id.* ¶ 54 (emphasis omitted).

[12] *Id.* ¶ 56.

[13] *Id.*

[14] *Id.* ¶ 58.

[15] *Id.*

On March 5, Collage's lead banker asked PSG to confirm it did not have "an intent to reduce compensation amongst the go forward employees."[16] PSG responded, "Of course not. We've got no intention of modifying comp or cutting headcount. We simply feel that if we're buying 100% of a business, we should not be restricted from operating it as we see fit (which of course includes board and management discussions, of which Joe and Kevin would be a part)."[17]

On March 10, the transaction closed. The transaction parties consummated the merger pursuant to the Agreement and Plan of Merger by and among ShootProof, LLC, Collage Merger Sub Inc., Lindsey Golden as Stockholder Representative, and Collage.com, Inc., dated March 10, 2021 (the "Merger Agreement").[18] ShootProof paid approximately two-thirds of the $91.4 million purchase price in cash and the remaining one-third in shares of common stock of ShootProof Parent Corp.[19] The Merger Agreement provides that Collage Class A common stock would be converted into the right to receive both cash and shares in ShootProof Parent Corp.[20] It also

---

[16] *Id.* ¶ 60.

[17] *Id.*

[18] Compl. Ex. A.

[19] Compl. ¶ 48; Compl. Ex. B at Recitals. ShootProof Parent Corp., a Delaware corporation, "is the owner of all the equity interests of ShootProof Senior LLC, a Delaware limited liability company . . . . ShootProof Senior LLC is the owner of all of the interests in ShootProof Intermediate, LLC, a Delaware limited liability company, which in turn is the owner of all of the equity interests of [ShootProof]." Compl. Ex. A §§ 1.1, 6.1; *id.* at Preamble.

[20] Compl. Ex. A § 3.1(c).

7

provides as a condition of closing that holders of Class A common stock would execute a Contribution and Exchange Agreement (the "Contribution and Exchange Agreement") by which the shares in ShootProof Parent Corp. would be converted into newly issued common limited partnership units in Holdings.[21] The Complaint defines "Rollover Shares" as the Holdings units that Plaintiff ultimately received.[22]

Plaintiff ultimately received $12,901,316 of the purchase price in Rollover Shares, and a seat on Holdings GP's board. Plaintiff viewed the Rollover Shares as an opportunity to share in the benefits of the transaction and the new entity's anticipated growth. As foretold in the Merger Agreement, he exchanged Shootproof Parent Corp. shares for partnership units in Holdings pursuant to the Contribution and Exchange Agreement dated March 10.[23] The Merger Agreement and the Contribution and Exchange Agreement are governed by Delaware law, and include integration and antireliance provisions.[24]

---

[21] Compl. Ex. A § 4.1(d)(vii); *id.* at Recitals; Compl. Ex. B.

[22] Compl. ¶ 48(d); *see also id.* at 6 n.2; *id.* ¶ 107. For its part, the Contribution and Exchange Agreement defines "Rollover Shares" as shares of ShootProof Parent Corp. that Collage's "Class A Stockholders" received pursuant to the Merger Agreement. Compl. Ex. B at Recitals; *see also* Compl. Ex. A at Recitals (explaining Class A Stockholders would receive "shares of Parent Corp Stock" pursuant to the Merger Agreement); *id.* § 1.1 (defining "Parent Corp Stock" as common stock in ShootProof Parent Corp.); *see also* AB at 13 ("Defendants cannot challenge the second element of [Plaintiff's RCW 21.20.010] claim because the Merger was clearly the sale of a security."). This opinion adopts Plaintiff's definition in considering his theory.

[23] Compl. Ex. B § 1.1.

[24] Compl. Ex. A §§ 8.10, 9.2, 9.8(a); Compl. Ex. B §§ 2.2(n), 4.7, 4.8(a).

Marshall stayed on as Foreground's CEO, and McDermott remained as CFO. But Collage's management team's role in Foreground was uncertain. On March 11, Plaintiff sent the legacy Collage employees an email that had been circulated to and approved by Defendants' representatives, including the Individual Defendants. The email stated "[n]o one is losing their jobs as a result of the merger" and "[e]veryone on our team is staying."[25] It also identified Plaintiff as "Chief ??? Officer" and indicated "Joe will manage an expanded research and analysis department, and pick up TBD leadership responsibilities once we better understand the needs to the combined organization."[26] Beginning on March 17, Plaintiff corresponded with Marshall about serving on Foreground's compensation committee.

On March 18, McDermott told Lindsey that she would be fired as general counsel based on PSG's discomfort with conflicts stemming from her marriage to Plaintiff. On March 21, Marshall withdrew his offer to Plaintiff to sit on Foreground's compensation committee. Around this time, Borders resigned from his position as Foreground CTO and was never replaced.

On April 13, Plaintiff asked Defendants to buy back his Rollover Shares. They refused. On April 21, Plaintiff met with Marshall to negotiate a potential separation agreement. Marshall's conditions included Plaintiff relinquishing his seat

---

[25] Compl. ¶ 66.

[26] *Id.*

9

on the Holdings GP board. Plaintiff refused unless Defendants bought out his Rollover Shares. Plaintiff declined to accept the terms of the separation agreement, and his employment at Foreground was terminated.

Plaintiff turned to this Court. On May 18, 2022, he filed a verified complaint (the "Complaint") seeking over $12 million in rescissory damages.[27] Count I alleges "Defendants made untrue statements of material fact" to Plaintiff "regarding the retention and involvement of Collage management and employees, in violation of the Revised Code of Washington, Title 21, Chapter 21.20, Section 21.20.010 ('RCW 21.20.010')" in connection with the sale of the Rollover Shares in Holdings while he was in Washington.[28] Count II alleges PSG, Holdings GP, and the Individual Defendants are "controlling persons of ShootProof within the meaning of" the Revised Code of Washington, Title 21, Chapter 21.20, Section 21.20.430 ("RCW 21.20.430"), and so are liable for PSG and ShootProof's violations of RCW 21.20.010.[29]

---

[27] Compl.

[28] *Id.* ¶¶ 106–113.

[29] *Id.* ¶¶ 114–121.

On June 13, Defendants moved to dismiss the Complaint (the "Motion") under Court of Chancery Rules 12(b)(2) and 12(b)(6).[30] The parties briefed the Motion, and I heard argument on November 9.[31]

## II. ANALYSIS

The Individual Defendants seek dismissal of the claims against them under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction. All Defendants have moved this Court to dismiss the action under Rule 12(b)(6) for failure to state a claim. For the reasons that follow, I conclude this Court lacks personal jurisdiction over the Individual Defendants, and the Complaint fails to state a claim upon which relief may be granted.

### A. This Court Lacks Personal Jurisdiction Over The Individual Defendants.

Courts can only adjudicate cases in which they have personal jurisdiction over the parties.[32] "Because a motion under Rule 12(b)(2) presents factual and legal questions, a court cannot grant it 'simply by accepting the well pleaded allegations of the complaint as true, because the pleader has no obligation to plead facts that

---

[30] D.I. 9.

[31] OB; AB; RB; D.I. 29; D.I. 30 [hereinafter "Hr'g Tr."].

[32] *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 129 (Del. 2016).

11

show the amenability of the defendant to service of process.'"[33] When a defendant moves to dismiss under Rule 12(b)(2), the plaintiff has the burden to show a prima facie case of personal jurisdiction over a nonresident defendant by demonstrating "specific facts," and not "rely[ing] on mere conclusory assertions."[34] "While such a showing is frequently made on the basis of documentary evidence and affidavits, and sometimes deposition or live testimony, in appropriate circumstances, a plaintiff also may make the necessary prima facie showing using only the facts alleged in the complaint."[35] Delaware courts can exercise personal jurisdiction over nonresident defendants by consent through conduct,[36] statutory means,[37] or by "dint of a contractual arrangement."[38]

---

[33] *Neurvana Med., LLC v. Balt USA, LLC* (*Neurvana I*), 2019 WL 4464268, at *2 (Del. Ch. Sept. 18, 2019) (quoting *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1131 (Del. Ch. 2008)).

[34] *Mobile Diagnostic Gp. Hldgs., LLC v. Suer*, 972 A.2d 799, 802 (Del. Ch. 2009) (citations omitted).

[35] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02, at 3-7 (2022) (internal quotation marks omitted) (quoting *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *11 n.93 (Del. Ch. Feb. 22, 2006), and citing *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *6 n.63 (Del. Ch. Sept. 1, 2006), *aff'd*, 930 A.2d 92 (Del. 2007)).

[36] *E.g.*, *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2010 WL 1838608, at *11 (Del. Ch. Apr. 28, 2010) (citing *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 989 (Del. Super. 2000)).

[37] *E.g.*, *Mobile Diagnostic*, 972 A.2d 799, 803 (Del. Ch. 2009); *BAM Int'l, LLC v. MSBA Gp. Inc.*, 2021 WL 5905878, at *5 (Del. Ch. Dec. 14, 2021).

[38] *BAM Int'l*, 2021 WL 5905878, at *6.

12

"Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[39] Consent renders a "minimum contacts" analysis unnecessary.[40] Contractual consent to jurisdiction only extends to claims identified by and encompassed by the consent provision.[41] "Forum selection/consent to jurisdiction clauses are 'presumptively valid' and should be 'specifically' enforced unless the resisting party 'could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud and overreaching.'"[42]

---

[39] *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964)); *accord Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008) (citing *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F.Supp.2d 423, 431 (D. Del. 1999)).

[40] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1145 (Del. 2010) ("[W]here contracting parties have expressly agreed upon a legally enforceable forum selection clause, a court should honor the parties' contract and enforce the clause, even if, absent any forum selection clause, the [common law] principle might otherwise require a different result." (collecting authorities)); *see BAM Int'l*, 2021 WL 5905878, at *6.

[41] *Ruggiero*, 948 A.2d at 1132 ("Of course, the party is bound only by the terms of the consent, and such consent applies only to those causes of action that are identified in the consent provision."); *Multi-Fineline Electronix, Inc. v. WBL Corp.*, 2007 WL 431050, at *6–7 (Del. Ch. Feb. 2, 2007) (finding defendants did not actually consent to jurisdiction because the complaint did not plead a dispute within the scope of the forum selection clause).

[42] *Cap. Gp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *3 (Del. Ch. Oct. 29, 2004) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972), and citing *Burger King v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)); *accord Salzberg v. Sciabacucchi*, 227 A.3d 102, 135 (Del. 2020) (citing and quoting *Bremen*, 407 U.S. at 15).

Plaintiff alleges that the Individual Defendants effectively consented to this Court's jurisdiction pursuant to the Merger Agreement's forum selection clause because they were intended third-party beneficiaries of, or closely related to, the Merger Agreement.[43] Section 9.8(b) provides, in pertinent part:

> The Parties hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court lacks jurisdiction, in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) over all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) and each Party hereby irrevocably agrees that all claims in respect of any such Action related thereto may be heard and determined in such courts.[44]

---

[43] Compl. ¶ 24; AB at 31–32. Plaintiff does not claim the Individual Defendants consented to jurisdiction under the Contribution and Exchange Agreement's forum selection clause. *See id.*; Compl. Ex. B § 4.8(b). But because Plaintiff's theory is pinned to the exchange of Holdings units under the Contribution and Exchange Agreement, I note for the sake of completeness that the Individual Defendants are not "Parties," signatories, or third-party beneficiaries to the Contribution and Exchange Agreement. Compl. Ex. B at Preamble; *id.* § 4.6 ("Nothing express or implied in this Agreement is intended or shall be construed to confer upon or give any person other than the parties and their respective successors and permitted assigns any right, benefit or remedy under or by reason of this Agreement."). Plaintiff does not argue the Individual Defendants received any benefit from the Contribution and Exchange Agreement, nor that it was foreseeable they would be bound. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[44] Compl. Ex. A § 9.8(b).

14

The Individual Defendants are not "Parties" to the Merger Agreement.[45]  And as a foundational principle, "Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."[46]  While Marshall signed the Merger Agreement on ShootProof's behalf, there is no evidence that either of the Individual Defendants purported to bind themselves individually to the Merger Agreement.

But Delaware law provides a framework for considering whether a forum selection clause is enforceable against those who are not otherwise individually bound by the agreement.  *Capital Group Companies, Inc. v. Armour* explains:[47]

> [A] court can enforce a forum selection provision against a non-signatory if the following three elements are met:  (i) the agreement contains a valid forum selection provision; (ii) the non-signatory has a sufficiently close relationship to the agreement, either as an intended third-party beneficiary under the agreement or under principles of estoppel; and (iii) the claim potentially subject to the forum selection provision arises from the non-signatory's standing relating to the agreement.[48]

---

[45] *Id.* at Preamble.

[46] *Ruggiero*, 948 A.2d at 1132 (internal quotation marks omitted) (quoting *Amaysing Tech. Corp. v. CyberAir Commc'ns, Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)); *accord Brown v. Colonial Chevrolet Co.*, 249 A.2d 439, 441 (Del. Super. 1968) ("As a general rule, so far as personal liability on corporate contracts is concerned, officers of corporations are in the same position as agents of private individuals and are not liable on corporate contracts as long as they do not act and purport to bind themselves individually." (citing 19 AM. JUR. 2D *Corporations* § 1341 (1965))).

[47] 2004 WL 2521295, at *5.

[48] *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1090 (Del. Ch. 2021) (citing *Cap. Gp.*, 2004 WL 2521295, at *5, and *Neurvana I*, 2019 WL 4464268, at *3), *cert. denied*

"For a non-signatory to be bound by a contract's forum selection clause, the answer to all three questions must be yes."[49]

Here, the parties do not dispute the first or third elements as to the whether the Individual Defendants are bound by the Merger Agreement: they only dispute the second.[50] "Under the second element of the *Capital Group* test, a forum selection provision can bind a non-signatory that has a sufficiently close relationship to the agreement, either as an intended third-party beneficiary under the agreement or based on principles of estoppel."[51]

The Individual Defendants are not intended third-party beneficiaries to the Merger Agreement. Section 9.13 of the Merger Agreement provides:

---

2021 WL 4170712 (Del. Ch. 2021); *see id.* at 1093 (addressing the third element and noting that "[d]espite making passing mention of standing, the [*Capital Group*] decision seems to have simply analyzed whether the claims fell within the scope of the forum selection provision."); *id.* at 1093–97 (analyzing the third *Capital Group* element).

[49] *Sustainability P'rs LLC v. Jacobs*, 2020 WL 3119034, at *5 (Del. Ch. June 11, 2020) (citing *Neurvana I*, 2019 WL 4464268, at *3).

[50] Hr'g Tr. 84; AB at 31; OB at 36–37; RB at 24–27.

[51] *Fla. Chem. Co.*, 262 A.3d at 1090.

16

> Third-Party Beneficiaries.  Except for the D&O Indemnified Person who shall have the right to enforce their respective rights under Section 7.5 and as contemplated by Section 7.6, and Article 8, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.  From and after the Closing, all of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.[52]

In other words, only "D&O Indemnified Person[s]" with rights under Section 7.5 are intended third-party beneficiaries.  Section 7.5 provides for indemnification of the Company's directors and officers.  It defines "D&O Indemnified Persons" as "each present and former director and officer of the Company."[53]  The "Company" is defined as Collage.[54]  The Individual Defendants were officers of ShootProof and Foreground, but not Collage.[55]  Accordingly, the Individual Defendants are not intended third-party beneficiaries to the Merger Agreement.

The Individual Defendants are also not bound by principles of estoppel. Those principles can bind nonsignatories who are "closely related" to an

---

[52] Compl. Ex. A § 9.13 (emphasis omitted).

[53] *Id.* § 7.5(a).

[54] *Id.* at Preamble.

[55] Compl. ¶¶ 1, 16, 17; OB at 7.

agreement.[56]  They do so only if:  (1) "the party receives a direct benefit from the agreement"; or (2) "it was foreseeable that the party would be bound by the agreement."[57]  "Although the direct-benefit and foreseeability inquiries have been articulated as disjunctive, many Delaware cases have relegated the foreseeability inquiry to a subordinate role."[58]

Plaintiff argues the Individual Defendants received a direct benefit from the Merger Agreement under *Baker v. Impact Holding, Inc.*[59]  Specifically, Plaintiff asserts the Individual Defendants directly benefitted from the Merger Agreement because they became officers in the post-transaction entity, Foreground.[60]  In *Baker*, the Court found that where a stock purchase agreement "expressly name[d]" a party as a director, he received a direct benefit that bound him to that agreement.[61]  That

---

[56] *Fla. Chem.*, 262 A.3d at 1092; *Neurvana I*, 2019 WL 4464268, at *4 (internal quotation marks omitted) (quoting *iModules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *3 (Del. Ch. Dec. 22, 2017) (ORDER), and citing *Cap. Gp.*, 2004 WL 2521295, at *6 nn.40 & 41).

[57] *Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (citing *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4 (Del. Ch. May 14, 2009)); *accord Fla. Chem.*, 262 A.3d at 1090–94.

[58] *Neurvana I*, 2019 WL 4464268, at *5 (footnote omitted) (citing *McWane, Inc. v. Lanier*, 2015 WL 399582, at *8 (Del. Ch. Jan. 30, 2015)).

[59] 2010 WL 1931032.

[60] AB at 31–32.

[61] *Baker*, 2010 WL 1931032, at *4.

party sued to enforce that benefit "received via the [agreement]," and was bound by its forum selection clause.[62]

Not so with the Individual Defendants. Unlike the agreement in *Baker*, the Merger Agreement did not "expressly name[]" them to their posts in the post-transaction entity.[63] Those positions were not "received via the" Merger Agreement.[64] "This Court's case law on this point is clear: to be bound by forum selection clauses, non-signatories must actually receive a benefit ***under or by way of the contract***."[65] That the Individual Defendants stayed on when ShootProof became Foreground is insufficient to bind the Individual Defendants to the Merger Agreement as nonsignatories.

Turning from direct benefit to foreseeability, this Court has applied the foreseeability inquiry as a standalone basis for satisfying the closely-related test in two scenarios: (1) where a nonsignatory defendant seeks to enforce a forum selection clause against a signatory plaintiff;[66] or (2) where a controlled nonsignatory, who bears a "clear and significant connection to the subject matter of

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Sustainability P'rs*, 2020 WL 3119034, at *6 (emphasis omitted and emphasis added).

[66] *Neurvana I*, 2019 WL 4464268, at *5–6 (citing *Ashall Homes Ltd. v. ROK Entm't Gp., Inc.*, 992 A.2d 1239, 1249 (Del. Ch. 2010), and *Lexington Servs. Ltd. v. U.S. Patent No. 8019807 Delegate, LLC*, 2018 WL 5310261, at *5–6 (Del. Ch. Oct. 26, 2018)).

19

the agreement," could be manipulated by controller signatories in an "end-run" around the agreement's forum selection clause.[67] "[T]he test should not extend to all non-signatories that a signatory 'happens to control.'"[68]

These facts do not resemble any of those limited scenarios. Plaintiff argues that the Individual Defendants are "closely-related to the [Merger Agreement] in such a way that it would be foreseeable that they would be bound" because they "were the CEO and CFO of ShootProof . . . and they were the lead negotiators for ShootProof with regard to the Merger Agreement."[69] The Individual Defendants' positions as officers and their contacts with the negotiating process are insufficient to bind them to the Merger Agreement under the foreseeability prong.[70] I conclude the Individual Defendants have not implicitly consented to the Merger Agreement's forum selection clause as nonsignatories under the *Capital Group* test.

Plaintiff alternatively alleges the Individual Defendants are subject to this Court's jurisdiction under 10 *Del. C.* § 3104. Where a nonresident defendant has not consented to personal jurisdiction, state courts can exercise personal jurisdiction

---

[67] *Id.* at *6 (citing and quoting *iModules*, 2017 WL 6596880, at *3–4, and then *Weygandt*, 2009 WL 1351808, at *2, *4–6, and then *Ashall Homes*, 992 A.2d at 1248).

[68] *Id.* (quoting *iModules*, 2017 WL 6596880, at *3).

[69] AB at 31 (internal quotation marks omitted) (quoting *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015), and then citing Compl. ¶ 46); *see also* AB at 32 (citing Compl. ¶¶ 25, 38, 41, 46, 56, 64, and Compl. Ex. A).

[70] *See supra* note 46 and accompanying text.

over her by either general jurisdiction or specific jurisdiction.[71]   In both cases, Delaware courts apply a two-prong analysis to determine whether the plaintiff satisfied its burden.[72]   First, courts consider whether the defendant has sufficient contacts for statutory jurisdiction.[73]   Section 3104(c)(3) is "a 'single act' statute that establishes jurisdiction over nonresidents on the basis of a single act or transaction engaged in by the nonresident within the state."[74]   Thus, Section 3104(c)(3) permits the exercise of "specific personal jurisdiction over claims arising from the jurisdictional contacts" at issue.[75]   Second, should the court find the long-arm statute applies, it "must 'evaluate whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment (the so-called 'minimum contacts' requirement).'"[76]

Plaintiff asserts specific jurisdiction over the Individual Defendants is warranted because they "engaged in substantial acts which caused the merger of two

---

[71] *See Genuine Parts*, 137 A.3d at 129–30.

[72] *Mobile Diagnostic*, 972 A.2d at 802.

[73] *Id.* at 803; *Genuine Parts*, 137 A.3d at 127 (noting that in the circumstance where Delaware cannot exercise general jurisdiction over a foreign corporation, the analysis turns to specific jurisdiction under the long-arm statute).

[74] *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *10 (Del. Ch. Nov. 21, 1995) (citing *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980), and *Tabas v. Crosby*, 444 A.2d 250, 254 (Del. 1982)).

[75] *Id.*

[76] *Mobile Diagnostic*, 972 A.2d at 803 (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 438 (Del. 2005)).

Delaware corporations," "are or were officers or directors of Delaware entities, including [Holdings GP] and [a] nonparty . . . Delaware corporation created for the purpose of the transaction that is the subject of th[e] complaint," and "made various fraudulent statements that give rise to the cause of action underlying the Complaint."[77] None of these acts support long-arm jurisdiction. "Causing" a merger governed by Delaware law, by itself, does not satisfy Section 3104(c).[78] A Delaware court cannot exercise personal jurisdiction over a director or officer for an act of the corporation simply because the officer or director directed the corporation to take that act.[79]

Neither does the creation of the Delaware corporation, Collage Merger Sub Inc., that merged into Collage to create Foreground.[80] Plaintiff does not allege the Individual Defendants formed the Delaware entity, only that they were officers or

---

[77] Compl. ¶¶ 25–26; AB at 34. Plaintiff's answering brief does not cite 10 *Del. C.* § 3114; any argument under that statute is waived. *Emerald P'rs*, 726 A.2d at 1224.

[78] *See Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *6–7 (Del. Ch. Dec. 13, 2021) (finding merger did not create long-arm jurisdiction over individual defendants where negotiations did not take place in Delaware and the relevant statements were not made within the state).

[79] *E.g.*, *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *10 n.40 (Del. Ch. Oct. 31, 2013) ("Where a director acts solely in that capacity to cause a corporation to take action, the corporation's action will not be attributed to the director for purposes of jurisdiction unless the plaintiff can establish that the corporation was acting as the director's agent or alter ego." (citation omitted)).

[80] Compl. ¶¶ 25–26; Compl. Ex. A at Recitals.

directors thereof.[81]  Even if he had so alleged, "merely participating in the formation of a Delaware entity, without more, does not create a basis for jurisdiction in Delaware."[82]  "Instead, 'the formation of a Delaware entity must be central to the plaintiff's claims of wrongdoing.'"[83]  While the creation of the merger subsidiary was a necessary step to complete the merger, it "cannot reasonably be viewed as an integral part of the wrongdoing by the individual defendants alleged in the Complaint."[84]

Finally, Plaintiff contends the Individual Defendants made various false statements in violation of Washington securities law.  But the merger negotiations did not take place in Delaware, the relevant statements were not made in Delaware, and Plaintiff was not in Delaware when he received them.[85]  Indeed, Plaintiff's Washington securities law claims hinge on his injury having taken place in Washington.  The injuries allegedly suffered have no nexus to Delaware.  The

---

[81] Compl. ¶¶ 25–26.

[82] *Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011).

[83] *Fortis*, 2021 WL 5893997, at *7 (quoting *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2017 WL 4711931, at *8 (Del. Ch. Oct. 19, 2017)).

[84] *Id.*

[85] *E.g.*, Compl. ¶ 108 ("Defendants made the material misrepresentations alleged herein to Joe . . . who was in Washington State.  Defendants also engaged in the transaction at issue, including the sale of securities to Joe while Joe was in Washington State.  Defendants also knew that Joe was going to acquire securities from his location in Washington State, and he did in fact acquire securities from his location in Washington State.").

Individual Defendants lack have committed no act in Delaware supporting specific statutory jurisdiction.

For the reasons explained, this Court does not have personal jurisdiction over the Individual Defendants and the Complaint is therefore dismissed as to them pursuant to Rule 12(b)(2). I decline to grant Plaintiff jurisdictional discovery.[86]

## B.      Plaintiff Fails To State A Claim Under Rule 12(b)(6).

Defendants also move to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. The standard for a motion to dismiss under Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[87]

---

[86] *Neurvana Med., LLC v. Balt USA, LLC* (*Neurvana II*), 2019 WL 5092894, at *2 (Del. Ch. Oct. 10, 2019) ("[T]he decision to grant jurisdictional discovery is discretionary."); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 816 n.195 (Del. Ch. 2009) ("It is also not appropriate to give the Stockholder Plaintiffs the benefit of jurisdictional discovery so they can fish for a possible basis for this court's jurisdiction. Before ordering personal jurisdiction discovery there must be at least 'some indication that this particular defendant is amenable to suit in this forum.'" (quoting *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995))), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

[87] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

24

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[88] This standard is "minimal"[89] and plaintiff-friendly.[90] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove [its] claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[91] Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the nonmoving party.[92] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[93]

Counts I and II both allege violations of Washington State's Blue Sky Laws based on extracontractual assurances made to Plaintiff during negotiations to the effect that he, his spouse, and his Collage colleagues would keep their jobs after the merger.[94] Count I alleges Defendants made material misrepresentations in

---

[88] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536–37 (Del. 2011).

[89] *Id.* at 536.

[90] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)).

[91] *Cent. Mortg. Co.*, 27 A.3d at 536.

[92] *E.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009) (citations omitted).

[93] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *4 (Del. Ch. July 24, 2009) (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[94] *E.g.*, Compl. ¶¶ 39, 41, 45, 59–66, 106–121; AB at 6–10, 20.

25

connection with the sale of Holdings's securities in violation of the Revised Code of Washington ("RCW") 21.20.010.[95] RCW 21.20.010(2) provides that: "[i]t is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . (2) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."[96] This provision was modeled on Section 101 of the Uniform Securities Act of 1956 and is substantially similar to Rule 10b-5 of the Securities Exchange Act.[97] To plead a claim under RCW 21.20.010(2), a plaintiff must demonstrate that: (1) the defendant made a statement "in connection with the offer, sale or purchase of any security, directly or indirectly;"[98] and (2) the statement was an "untrue statement of material fact" or an omission of a material fact that, "in light of the circumstances under which [the statements] are made," would be misleading.[99]

Count II alleges PSG, Holdings GP, and the Individual Defendants are liable under RCW 21.20.430 for PSG and ShootProof's alleged violations of RCW

---

[95] Compl. ¶¶ 106–113; *id.* at 17.

[96] RCW 21.20.010(2).

[97] *See Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC*, 449 P.3d 1019, 1022, 1027 (Wash. 2019).

[98] Defendants do not challenge this element. RB at 6 n.10; AB at 13; Hr'g Tr. 64.

[99] RCW 21.20.010(2).

21.20.010.[100]  A finding on Count II necessarily depends on whether Plaintiff has stated a claim in Count I.[101]  I begin with Count I.

Defendants argue Plaintiff has failed to overcome the antireliance provision in the Contribution and Exchange Agreement and the integration provisions in that agreement and the Merger Agreement.[102]  Alternatively, Defendants assert Plaintiff failed to allege the extracontractual statements were false when made.  I need only address Defendants' first argument.

---

[100] Compl. ¶¶ 114–121; *id.* ¶ 120 ("PSG and ShootProof committed violations of RCW 21.20.010.").  Under RCW 21.20.430, a person who buys or sells securities in violation of RCW 21.20.010, or a person who directly or indirectly controls a buyer or seller who transacted securities in violation of RCW 21.20.010 is liable to the counterparty in the securities transaction.  RCW 21.20.430(1)–(3).  It is unclear whether Plaintiff is pursuing Count II under RCW 21.20.430(2) against the identified Defendants as sellers, or just RCW 21.20.430(3) against the identified Defendants as alleged controllers of the sellers.  Compl. ¶¶ 114–121.

[101] RCW 21.20.430(1) ("Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010, . . . is liable to the person buying the security from him or her . . . ."); RCW 21.20.430(2) ("Any person who buys a security in violation of the provisions of RCW 21.20.010 is liable to the person selling the security to him or her . . . ."); RCW 21.20.430(3) ("Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, . . . is also liable jointly and severally with and to the same extent as the seller or buyer . . . .").

[102] The Merger Agreement is mutually integrated with the Contribution and Exchange Agreement.  Compl. Ex. B § 4.7; Compl. Ex. A § 9.2.  The Merger Agreement also has an antireliance provision.  Compl. Ex. A § 8.10.  Defendants only wield the provisions in the Contribution and Exchange Agreement and the Merger Agreement's integration provision, perhaps because the Merger Agreement's antireliance provision in Section 8.10 only applies to ShootProof and its representatives.  *E.g.*, OB at 10, 18 & n.60; RB at 7 n.11; Compl. Ex. A § 8.10.

1.   **Sections 2.2(n) And 4.7 Of The Contribution And Exchange Agreement Do Not Violate Washington's Antiwaiver Statute And Are Not Void.**

Plaintiff asserts the antireliance and integration provisions must be void as against Washington securities law claims because they are waivers of such claims, and such waivers are precluded by Washington statute. Plaintiff asserts that a provision trimming actionable statements to only those on which a plaintiff can rely is an impermissible waiver of otherwise actionable securities claims, and therefore void under RCW 21.20.430(5). As I read Washington law, these provisions are permissible and not void.

Washington's securities laws provide that parties cannot contractually waive compliance with those laws. Under RCW 21.20.430(5), "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any rule or order hereunder is void."[103] Washington courts have described this section as evidencing the Washington legislature's "intention to hold violators strictly accountable" by "prohibit[ing] a purchaser . . . from contractually agreeing to waive the protections

---

[103] RCW 21.20.430(5).

of the Act's remedy provision."[104]  In perhaps a more familiar context for Delaware readers, the Exchange Act contains an identical provision in Section 29(a).[105]

In 2004, the Washington Court of Appeals in *Stewart v. Estate of Steiner* held a waiver or release of Washington securities claims is distinguishable from a waiver of compliance with the Securities Act of Washington:  it instructed that merely limiting the bases for a fraud action "does not require anyone to waive compliance with the [Securities Act of Washington]."[106]  *Stewart* rejected the argument that a subscription agreement's nonreliance provision violated RCW 21.20.430(5)'s antiwaiver language.[107]

---

[104] *Go2net, Inc. v. Freeyellow.Com, Inc.*, 143 P.3d 590, 592 (Wash. 2006) (discussing RCW 21.20430(5) and itsresulting effect) (internal quotation marks omitted) (quoting *Go2Net, Inc. v. Freeyellow.com, Inc.*, 109 P.3d 875, 881 (Wash. Ct. App. 2005), *aff'd*, 143 P.3d 590).

[105] *See* 15 U.S.C. § 78cc(a).  *But see Kittilson v. Ford*, 608 P.2d 264, 265 (Wash. 1980) ("The coordination of the federal courts with federal regulations does not require imitation by this court in construing our act, only that our construction not interfere with the federal scheme." (citation omitted)).

[106] *Stewart v. Est. of Steiner*, 93 P.3d 919, 925 (Wash. Ct. App. 2004).

[107] *Id.* (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 343–44 (2d Cir. 1996)).  *Stewart* also held that Washington's securities laws required a plaintiff to prove reliance on the misrepresentation. *Id.* at 924; *see also FMC Techs., Inc. v. Edwards*, 2007 WL 1725098, at *4 (W.D. Wash. June 12, 2007) (noting the significance of a valid antireliance provision in the context of an otherwise investor-friendly securities law claim requiring a determination of reasonable reliance), *aff'd*, 302 F. App'x 577 (9th Cir. 2008).  But in 2019, the Washington Supreme Court in *Federal Home Loan Bank of Seattle v. Credit Suisse Securities (USA) LLC* held that "reliance is *not* an element of a private securities claim under [RCW 21.20.010(2)]."  449 P.3d at 1021.

Plaintiff argues *Federal Home Loan* also set aside *Stewart*'s characterization of a nonreliance provision as a proper limitation on grounds for a securities claim rather than

*Stewart* relied on *Harsco Corp. v. Segui* by the United States Court of Appeals for the Second Circuit, which provides that while integration and nonreliance clauses "limit[] the bases upon which a fraud action could be brought," they do not run afoul of the analogous "anti-waiver" provision of the Securities Exchange Act's Section 29(a).[108]  The Second Circuit distinguished between "a contractual provision which prohibits a party from suing at all," which would violate Section 29(a), and integration and nonreliance clauses.[109]  And in 2022, the United States District Court for the Western District of Washington in *Zunum Aero, Inc. v. Boeing Company*

---

an improper waiver.  Plaintiff also argues that because reliance is no longer an element of a Washington securities law claim, a nonreliance clause cannot preclude a Washington securities law claim.  According to Plaintiff, enforcing an antireliance provision would improperly limit those claims only to statements on which a plaintiff relied, in contravention of *Federal Home Loan Bank*'s removal of reliance as an element of those claims.  *See* 449 P.3d at 1021.

But, as best I can tell, Washington law still permits such limitations.  No language in *Federal Home Loan* addresses the validity of a nonreliance clause.  *See generally Fed. Home Loan*, 449 P.3d 1019.  And last year, the District Court for the Western District of Washington enforced contractual acknowledgements of certain facts as limitations on what statements the plaintiff could point to as fraudulent—and cited *Stewart*. *Zunum Aero, Inc. v. Boeing Co.*, 2022 WL 2116678, at *14 (W.D. Wash. June 13, 2022) (agreeing with defendant that "Zunum cannot for purposes of this claim disavow these contractual acknowledgments and contend that it was misled" in violation of RCW 21.20.010(2) (citing *Stewart*, 93 P.3d at 924, and *Hammond v. Everett Clinic, PLLC*, 2021 WL 961130, at *5–6 (Wash. Ct. App. Mar. 15, 2021)), *reconsid. denied*, 2022 WL 2342891, at *5 (W.D. Wash. June 29, 2022) (denying reconsideration of its holding that the contracts at issue foreclosed the plaintiff's securities fraud claim).  I read *Zunum* to stand for the proposition that even after *Federal Home Loan* clarified that reliance is not an element of a Washington securities fraud claim, contractual provisions can still properly operate to limit the universe of statements on which a plaintiff can bring a claim.

[108] *Harsco*, 91 F.3d at 343–44.

[109] *Id.* at 344.

dismissed a claim under RCW 21.20.010(2) because the contract foreclosed misrepresentation claims, citing *Stewart*.[110]  I read Washington common law to hold that contractual provisions can properly limit the universe of actionable misrepresentations without running afoul of the statutory prohibition against waiving compliance with securities law.[111]

Sections 2.2(n) and 4.7 of the Contribution and Exchange Agreement do not operate as a waiver in violation of RCW 21.20.430(5).  The plain language of Contribution and Exchange Agreement Sections 2.2(n) and 4.7 do not require Plaintiff or anyone to "waive compliance with any provision . . . or any rule or any order" under the Securities Act of Washington.[112]  Nor do they prohibit Plaintiff

---

[110] *Zunum*, 2022 WL 2116678, at *14 (citing *Stewart*, 93 P.3d at 924, and *Hammond*, 2021 WL 961130, at *5–6); *id.* at *15 ("Zunum fails to state a plausible securities fraud claim because the 2016 PIA and 2017 and 2018 IRLs foreclose its claim . . . .").

[111] Plaintiff looks to law outside Washington to argue that antireliance and integration provisions violate the Securities Act of Washington's antiwaiver provision.  Given Washington's binding authority on the matter, Plaintiff's cited authorities are not persuasive.  *E.g.*, *Zunum*, 2022 WL 2116678, at *14 (citing *Stewart*, 93 P.3d at 924, and *Hammond*, 2021 WL 961130, at *5–6); *Stewart*, 93 P.3d at 924–25; *Kittilson*, 608 P.2d at 265 (holding that coordination with federal courts interpreting federal securities law "does not require imitation" by Washington courts "in construing [Washington's securities] act, only that [Washington's] construction not interfere with the federal scheme").  *See AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 181–82 (3d Cir. 2003) (holding that reliance is an element of a Rule 10b-5 claim, and that enforcing a nonreliance clause is inconsistent with Section 29(a)'s prohibition on anticipatory waiver); *Kronenberg v. Katz*, 872 A.2d 568, 593, 597–98 (Del. Ch. 2004) (noting an integration clause alone, unaccompanied by a nonreliance clause, cannot bar a Pennsylvania blue sky claim based on extracontractual statements, and explaining "[p]arties who wish to protect themselves against fraud claims can seek explicit anti-reliance language that will have that effect").

[112] RCW 21.20.430(5); *Stewart*, 93 P.3d at 925.

from suing at all.[113]  Section 2.2(n) of the Contribution and Exchange Agreement provides:

> Representations and Warranties of the Rollover Sellers.  To induce the Partnership to issue the Partnership Units as herein provided, each Rollover Seller (severally and not jointly) hereby represents and warrants to the Partnership as follows: . . . (n) Such Rollover Seller acknowledges that the only representations and warranties made by or on behalf of the Partnership are the representations and warranties expressly set forth in Sections 2.1 and, except for the representations and warranties expressly set forth in Sections 2.1, such Rollover Seller has not relied upon any other express or implied representations or warranties or any other information.[114]

Plaintiff is a "Rollover Seller" under the Contribution and Exchange Agreement.[115]

Section 4.7 provides:

---

[113] *Harsco*, 91 F.3d at 344.  In connection with the transaction, Plaintiff also executed a "Restrictive Covenants Agreement."  *See* Compl. Ex. B § 4.7 (integrating the Contribution and Exchange Agreement with the Merger Agreement and "Ancillary Documents referred to herein or therein"); Compl. Ex. A § 1.1 (defining "Ancillary Documents" to include "each Restrictive Covenants Agreement").  Defendants acknowledged they "are not moving to dismiss the Complaint on the basis of the release or covenant not to sue [in the Restrictive Covenants Agreement] because they are cognizant of the 'anti-waiver' language of the [Securities Act of Washington]."  OB at 9 n.26; AB at 20 (quoting OB at 9 n.26).  The Restrictive Covenants Agreement is not integral to the Complaint, so I do not reach whether it operates as an impermissible waiver under RCW 21.20.430(5).  *Fortis Advisors LLC v. Allergan W.C. Hldg. Inc.*, 2019 WL 5588876, at *3 (Del. Ch. Oct. 30, 2019).

[114] Compl. Ex. B § 2.2(n) (emphasis omitted).

[115] *Id.* at Schedule I.

Entire Agreement; Other Matters. This Agreement, the Partnership Agreement, the Merger Agreement, the Ancillary Documents and the other writings referred to herein or therein or delivered pursuant hereto or thereto constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the parties, with respect to the subject matter hereof.[116]

The Contribution and Exchange Agreement's antireliance and integration sections merely limit the scope of representations on which Plaintiff may rely.[117] Accordingly, Sections 2.2(n) and 4.7 are not void, and they must be applied to Plaintiff's claims.

### 2. Sections 2.2(n) And 4.7 Of The Contribution And Exchange Agreement Foreclose Plaintiff's Count I Claim Under RCW 21.20.010(2).

Plaintiff alleges "Defendants made untrue statements of material fact to [him] regarding the retention and involvement of Collage management and employees."[118] As pled, Count I's claim for violation of RCW 21.20.010(2) is based on allegedly misleading extracontractual statements or omissions in connection with the sale of Holdings's securities, which he received solely pursuant to the Contribution and

---

[116] *Id.* § 4.7 (emphasis omitted).

[117] *See, e.g.*, *Zunum*, 2022 WL 2116678, at *14 (citing *Stewart*, 93 P.3d at 924, and *Hammond*, 2021 WL 961130, at *5–6); *Stewart*, 93 P.3d at 925 (citing *Harsco*, 91 F.3d at 343–44).

[118] Compl. ¶ 107; *id.* ¶ 110 ("Defendants made material misrepresentations concerning Joe's, Kevin's, and Lindsey's roles in the combined company after the sale, as well as the retention of Collage employees, including specific material, false statements alleged above and the material omissions of fact necessary to make the statements not misleading.").

Exchange Agreement.[119]  Count I makes no allegations about the intermediate receipt of ShootProof Parent Corp. securities under the Merger Agreement.  I therefore consider the challenged sale of securities to be the sale of Holdings securities under the Contribution and Exchange Agreement.[120]

In the Contribution and Exchange Agreement, Plaintiff expressly represented and agreed, inter alia, that:  (i) the Contribution and Exchange Agreement, "the [Holdings] Partnership Agreement, the Merger Agreement, the Ancillary Documents [as defined in the Merger Agreement] and the other writings referred to herein or therein or delivered pursuant hereto or thereto constitute the entire

---

[119] *Id.* ¶ 107 ("As sellers of securities in the form of Rollover Shares in ShootProof Holdings, LP, Defendants made untrue statements of material fact to Joe . . . ."); *id.*. ¶ 48(d) (defining "Rollover Shares" as "equity in [Holdings]"); *id.* at 6 n.2 ("A copy of the Contribution and Exchange Agreement, dated March 10, 2021 (the 'Contribution Agreement'), pursuant to which [Plaintiff] received Rollover Shares and exchanged those Rollover Shares for Partnership Units (as those terms are defined in the Contribution Agreement), is attached as Exhibit B.").  Plaintiff received partnership units in Holdings pursuant to the Contribution and Exchange Agreement.  Compl. Ex. B at Recitals; *see supra* note 22 (explaining the Contribution and Exchange Agreement defines "Rollover Shares" as shares of ShootProof Parent Corp. that Collage's Class A common stockholders received pursuant to the Merger Agreement).

[120] *Kinney v. Cook*, 154 P.3d 206, 211 (Wash. 2007) ("At a minimum, a sale includes a mutual agreement to exchange a security."); *Mehta v. Mobile Posse, Inc.*, 2019 WL 2025231, at *2 (Del. Ch. May 8, 2019) ("[T]he Court does not rely on those exhibits that contradict the complaint's well-pled facts."); *Parseghian ex rel. Gregory J. Parseghian Revocable Tr. v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *9 (Del. Ch. June 21, 2022) ("A Court must examine what has been alleged in the pleadings, not what a plaintiff believes has been alleged." (quoting *Gabelli & Co., Inc. v. Liggett Gp., Inc.*, 1983 WL 18015, at *3 (Del. Ch. Mar. 2, 1983), *aff'd*, 479 A.2d 276 (Del. 1984))).

agreement" between the parties;[121] and (ii) "the only representations and warranties made by or on behalf of the [Holdings] are the representations and warranties expressly set forth" therein.[122]

Plaintiff does not contest that these antireliance and integration provisions generally perform their typical functions. Rather, he contends that integration clauses, alone, do not bar fraud suits, citing Washington and Delaware law.[123] Under Washington law, an integration clause alone may not bar a fraud claim law, but it can when read together with an antireliance clause, as in the Contribution and Exchange Agreement.[124] Moreover, the functioning of these provisions in the abstract is a matter of Delaware law: the Contribution and Exchange Agreement is governed by Delaware law.[125] Under Delaware law, contractual antireliance language is effective when it identifies the specific information on which a party has considered in entering the contract to the exclusion of other information.[126] The

---

[121] Compl. Ex. B § 4.7; Compl. Ex. A § 1.1 (defining "Ancillary Documents").

[122] Compl. Ex. B § 2.2(n).

[123] AB at 17 (citing *FMC Techs.*, 2007 WL 1725098, at *5, and *Helenius v. Chelius*, 120 P.3d 954, 965–66 (Wash. Ct. App. 2005), and *Kronenberg*, 872 A.2d at 575).

[124] *See, e.g.*, *FMC Techs.*, 2007 WL 1725098, at *4 (citing *Helenius*, 120 P.3d at 963–66).

[125] Compl. Ex. B § 4.8(a).

[126] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015) (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012)); *MidCap Funding X Tr. v. Graebel Cos., Inc.*, 2020 WL 2095899, at *19–20 (Del. Ch. Apr. 30, 2020) (holding that because the plaintiffs represented they only relied on the particular information delineated by the antireliance and integration provisions, the plaintiff's

Contribution and Exchange Agreement plainly contains such language in Sections 2.2(n) and 4.7.[127]

Plaintiff does not dispute that the misrepresentations upon which he bases his claims are extracontractual.[128] The only alleged misstatements about the retention or involvement of management or employees occurred outside the four corners of the Contribution and Exchange Agreement and the agreements integrated under Section 4.7, including the Merger Agreement. For example, Plaintiff alleges Defendants made misstatements in the parties' December 2020 letter of intent.[129] The letter of intent is extracontractual. Plaintiff also alleges "Defendants [made] numerous material misrepresentations and omissions in connection with the merger negotiations and sale of ShootProof equity securities to [him]."[130] Plaintiff cites conversations, slide decks, and emails between the parties during pre-closing

---

representation "establishes the universe of information on which that party relied" (internal quotation marks omitted) (quoting *Prairie Cap. III*, 132 A.3d at 51)); *see also Kronenberg*, 872 A.2d at 593 ("Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims.").

[127] Compl. Ex. B §§ 2.2(n), 4.7.

[128] *See* AB at 6–10, 20.

[129] Compl. ¶¶ 40–41.

[130] *Id.* at 17 (capitalization altered); *id.* ¶¶ 39, 49–66.

negotiations.[131]  One email documents the removal of restrictive operating covenants around employee compensation from the Merger Agreement.[132]  Plaintiff also cites Defendants' approval of a post-closing email he sent as evidence of a misleading "assurance."[133]  These, too, are extracontractual.

The plain and unambiguous language of the antireliance and integration provisions in Contribution and Exchange Agreement Sections 2.2(n) and 4.7, respectively, foreclose Plaintiff's allegations that Defendants violated RCW 21.20.010(2) by making misleading extracontractual statements or omissions.[134] Defendants' Motion is granted as to Count I.

---

[131] *E.g.*, *id.* ¶ 39 (alleging Defendants made false assurances in late 2020 conversations); *id.* ¶ 52 (alleging Marshall made misstatements to Joe in a January 29, 2021 conversation); *id.* ¶ 53 (alleging Marshall made misrepresentations to Plaintiff in February 2021 emails); *id.* ¶ 54 (alleging Marshall made misrepresentations to Plaintiff in a February 11, 2021 slide deck); *id.* ¶¶ 55–59 (alleging Marshall made misrepresentations to Lindsey in March 2021 emails); *id.* ¶ 60 (alleging a PSG principal made a "materially false" statement to Collage's lead banker that the banker forwarded to Plaintiff).

[132] *Id.* ¶ 60.

[133] *Id.* ¶ 66.

[134] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006) ("[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." (collecting cases)); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) ("Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations." (collecting cases)); *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and

### 3. Plaintiff's Count II Claim Under RCW 21.20.430 Fails Without An Underlying Violation Of The Securities Act Of Washington.

Count II alleges PSG, Holdings GP, and the Individual Defendants are liable under RCW 21.230.430 for the securities law violations alleged in Count I.[135] RCW 21.20.430 provides, in pertinent part:

> (2) Any person who buys a security in violation of the provisions of RCW 21.20.010 is liable to the person selling the security to him or her, who may sue either at law or in equity to recover the security, together with any income received on the security, upon tender of the consideration received, costs, and reasonable attorneys' fees, or if the security cannot be recovered, for damages. . . .

> (3) Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

---

provisions, without resort to extrinsic evidence." (internal quotation marks omitted) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010))).

[135] Compl. ¶¶ 114–121; *id.* ¶ 116 ("PSG, [Holdings] GP, and the Individual Defendants (the 'Control Defendants'), as executive officers, owners, and/or 'persons' who directly or indirectly control [Holdings], are liable jointly and severally with and to the same extent as [Holdings] under RCW 21.20.430."); *id.* ¶ 120 ("PSG and ShootProof committed violations of RCW 21.20.010."); *id.* ¶ 119 ("PSG, [Holdings] GP, Marshall, and McDermott are controlling persons of ShootProof within the meaning of RCW 21.20.430.").

Having concluded Plaintiff has failed to state the requisite claim for violation of RCW 21.20.010(2), he cannot establish liability under RCW 21.20.430.[136] Defendants' Motion is granted as to Count II.

## III. CONCLUSION

Defendants' Motion to Dismiss is **GRANTED**. Counts I and II are dismissed with prejudice.

---

[136] *E.g., Hunichen v. Atonomi LLC*, 2022 WL 971567, at *7 (W.D. Wash. Mar. 31, 2022) (dismissing a counterclaim under RCW 21.20.430(2) where the counterclaimant failed to "set forth a plausible claim for fraud or other conduct that would violate RCW 21.20.010").